1 Henry M. Mitchell, Jr., #V16058
  f.k.a. Henry Cephus Hayes
2 Pelican Bay State Prison
  P.O. Box 7500 (D6-118)
3 Crescent City, CA 95532-7500

4 In Propria Persona



FILED

APR 0 1 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

5

6

7

8              UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10 HENRY MOSES MITCHELL, JR.               Case No._____
   f.k.a. Henry Cephus Hayes,
11
          Plaintiff,
12
       v.                                 2: 1 9 - CV - 0 5 6 3    AC PC
13
   GAVIN NEWSOM, EDMUND G. BROWN, JR.,
14 JACKIE LACEY, JENNIFER SHAFFER, THE
   SUPERIOR COURT OF CALIFORNIA,
15
          Defendant(s)
16

17                      COMPLAINT

18 Plaintiff HENRY MOSES MITCHELL, JR. alleges as follows:

19                  I. NATURE OF THE CASE

20 1. This is an action for injunctive and declaratory relief

21 pursuant to the Due Process and Equal Protection Clauses of the

22 Fourteenth Amendment to the United States Constitution.

23                     II. PARTIES

24 2. Plaintiff HENRY MOSES MITCHELL JR. is in the care and custody

25 of the California Department of Corrections and Rehabilitation

26 since December 3, 2003. He has maintained his innocence of the

27 crimes for which he was convicted by jury.



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
J5 2839-1

-1-

3. Defendant GAVIN NEWSOM is the current Governor of the State of California, and successor to Defendant EDMUND G. BROWN, JR.

4. Defendant JACKIE LACEY is the District Attorney of Los Angeles County since December 3, 2012.

5. Defendant JENNIFER SHAFFER was appointed executive officer for the California Board of Parole Hearings by Defendant Edmund G. Brown, Jr., on June 10, 2011.

6. Defendant SUPERIOR COURT OF CALIFORNIA is a Judicial entity created by Article VI of the California Constitution.

### III. JURISDICTION AND VENUE

7. This court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §2201 based on 42 U.S.C. §1983 and questions of federal constitutional law.

8. This court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the state law claims.

9. Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. §1391(b)(2). A substantial part of the events, acts, or omissions giving rise to the claims occurred in Sacramento County, California. Sacramento County is in the Eastern District of California pursuant to 28 U.S.C. §128(b).

### IV. FACTS

10. On December 29, 2017, Plaintiff mailed through prison mail a copy of his Application for Commutation of Sentence, along with a copy of Notice of Intent to Apply for Executive Clemency and Statement of Notice to District Attorney and Declaration under penalty of perjury to Defendant JACKIE LACEY pursuant to California



1  Penal Code sections 4804 and 4805. [Exhibit 1]

2  11. On January 9, 2018, Plaintiff sent copies of his Application

3  for Commutation of Sentence, along with copy of the Notice of

4  Intent to Apply for Executive Clemency and Statement of Notice

5  to District Attorney and Declaration under penalty of perjury to

6  Defendant EDMUND G. BROWN,JR. [Exhibit 1]

7  12. On January 11, 2018, Plaintiff sent copies of his Application

8  for Commutation of Sentence, along with copy of the Notice of

9  Intent to Apply for Executive Clemency and Statement of Notice

10  to District Attorney and Declaration under penalty of perjury to

11  Defendant JENNIFER SHAFFER. [Exhibit 1]

12  13. On April 4, 2018, the Law Offices of Parker · Stanbury LLP

13  sent request on behalf of Plaintiff requesting that Plaintiff

14  be afforded the proper interview in consideration of the request

15  for clemency application. [Exhibit 2] No response was provided.

16  14. On September 4, 2018, C. Wofford, former Warden and retired

17  annuitant in charge of commutations informed prison officials

18  that Plaintiff was not logged in the Board of Parole Hearings

19  tracking system regarding a sentence commutation at that time.

20  15. Prior to January 3, 2019, Defendant EDMUND G. BROWN, JR. was

21  provided with complete packets for commutation of clemency from

22  numerous white applicants, including interview recordings. This

23  is from personal knowledge of Plaintiff, that he was excluded

24  based upon race can be inferred by the denial of complete and

25  equal treatment for all applicants for clemency.

26  16. It can be further inferred that Defendants JACKIE LACEY and

27  SUPERIOR COURT OF CALIFORNIA have weighed in on the clemency in

-3-

1 violation of Article III, section 3 of the State of California

2 Constitution [Separation of Powers].

3 17. Plaintiff in his Application for Commutation of Sentence and

4 other supporting documents made it evidently clear that he was

5 innocent of the crimes in which he was charged. As such proof,

6 he included numerous postconviction transcripts showing the

7 DefendantJACKIE LACEY working in concert with the Los Angeles

8 County Department of Coroner, and the Los Angeles Police withheld

9 critical evidence from Plaintiff which should have be presented

10 to the jury. Including but not limited to the destruction of key

11 forensic evidence used by the medical examiner, and destroyed

12 by that department three years before Plaintiff went on trial. This

13 was never provided to trial counsel or Plaintiff before trial. That

14 the Los Angeles Police Department paid witness protection funds

15 outside of the statutory requirements for granting such funds.

16 Such witness was not legally eligible for such funds as a matter of

17 law, but was not provided to Plaintiff or trial counsel before

18 trial. Finally, that DefendantLACEY's office withheld criminal

19 history of a witness and did not provide that witness's interview

20 report to trial counsel or Plaintiff. Trial counsel failed to

21 investigate  each of the above incidents verified by postconviction

22 proceedings. Lastly, that the Los Angeles Police Department did

23 not have latent finger prints searched through all state and

24 federal IAFIS sytems prior to trial. Unidentified prints remain.

25 ///

26 //

27 /



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
95 28391

## V. CAUSES OF ACTION

18. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-17.

### FIRST CAUSE OF ACTION:

**PLAINTIFF FAILED TO RECEIVE ADEQUATE NOTICE OF THE ISSUES TO BE CONSIDERED OR OPPORTUNITY TO BE HEARD IN HIS REQUEST FOR CLEMENCY**

19. The Ninth Circuit Court of Appeals has determined that a litigant has the right to "receive notice of the issues to be considered in his request for clemency." (Anderson v. Davis, 279 F.3d 674, 676 (9th Cir. 2002)). Plaintiff was not afforded that constitutional due process right.

20. The Ninth Circuit also recognized that "some minimal procedural safeguards apply to clemency proceedings." Anderson, supra, 279 F.3d at 765 (9th Cir. 2002)("The legal authority for his case rests largely on the language from Justice O'Connor's opinion in Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 289 (1998)(O'Connor, J. concurring, with whom Justice SOUTER, Justice GINSBURG, and Justice BRYER join.)

21. Plaintiff submitted the proper application for clemency to the respective persons or entities required by state law. Unlike Anderson, who did receive acknowledgement of his application process from the Legal Affairs Office, Id. at 676-677, Plaintiff nor his counsel received any response from Defendant BROWN.

22. The Supreme Court has recognized that a lack of adequate notice of the issues to be considered  implicates a fundamental right to due process. (See Lankford v. Idaho, 500 U.S. 110, 126 (1991)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

I5  28391

1                         SECOND CAUSE OF ACTION:

2            CALIFORNIA'S COMMUTATION SCHEME VIOLATES THE
             SEPARATION OF POWERS UNDER CONSTITUTIONAL
3            DOCTRINE DENYING PLAINTIFF DUE PROCESS OF LAW

4   23. The Constitution of California codifies in Article III, §3,

5   "The powers of state government are legislative, executive, and

6   judicial. Persons charged with the exercise of one power may not

7   exercise either of the others except as permitted by this

8   Constitution."

9   24. California Penal Code, section 4803 is a statutorial law, not

10  a constitutional law. It tranfers judicial power to the executive

11  branch with regards to commutation proceedings.

12

13  25. Section 4803 of the California Penal Code provides:

14          "When an application is made to the Governor for
            pardon or commutation of sentence, or when an
15          application has been referred to the Board of
            Parole Hearings, the Governor or the board may
16          require the judge of the court before which the
            conviction was had, or the district attorney by
17          whom the action was prosecuted, to furnish the
            Governor or the board, without delay, with a
18          summarized statement of the facts proved on the
            trial, and of any other facts having reference
19          to the propriety of granting or refusing said
            application, together with his or her recommendation
20          for or against the granting of the same and his
            or her reason for such recommendation."

21

22  26. On his last day in office, then Governor Arnold Schwarzenegger

23  exercised his executive clemency power by reducing the prison

24  sentence of Esteban Nunez from 16 years to seven. The order was

25  signed December 31, 2010. The commutation came as a complete

26  surprise to the parents of Luis Santos, the other victims, and

27  the prosecuting district attorney.

1 27. As a result of this exercise of executive power, a lawsuit was
2 filed in the Superior Court of Sacramento against then Governor
3 Edmund G. Brown, Jr., former Governor Arnold Schwarzenegger, the
4 California Department of Corrections, the then Secretary of
5 Corrections Matthew Cate, and Warden William Knipp. The Plaintiffs
6 were Frederico Santos, Bonnie M. Dumanis, District Attorney of
7 San Diego County, and other victims.

8 28. After losing in trial and on appeal to reverse the executive
9 power of a Governor to commute a sentence, the California
10 legislature enacted Assembly Bill No. 648 (Clemency)(2011-2012).

11 29. The Assembly Bill No. 648, amended Penal Code section 4803 to
12 impose judicial authority into the clemency process. It further
13 added Penal Code section 4805 to provide notice to the district
14 attorney of any application for pardon or commutation submitted
15 to the Governor, with further judicial power to deny such filings.

16 30. Accordingly, this is evidence and information suggesting that
17 Defendant BROWN, Defendant NEWSOM, or any future California
18 Governor cannot be "[a] state officer of conscience and intellectual
19 discipline, capable of judging a particular controversy fairly on
20 the basis of its own circumstances." (See Anderson v. Davis, 279
21 F.3d 674, 677 (9th Cir. 2002)(citing Withrow v. Larkin, 421 U.S.
22 35, 54 (1975).

23 31. California Constitution Article VI, sec. 10 does not provide
24 the trial court original jurisdiction in clemency proceedings. Thus
25 to permit Penal Code section 4803 and 4805 to remain violates the
26 Due Process Clause of the Fourteenth Amendment in the Governor's
27 exercise of executive power.



32. The Ninth Circuit has determined that:

> "A state clemency petition, of course, is directed to and acted on by the state's executive branch wholly separate from the state judiciary, its judgments, and its appellate review process." Malcom v. Payne, 281 F.3d 951, 960 (9th Cir. 2002).

33. As structured and codified, Penal Code sections 4803 and 4805, is "other collateral review" subject to judicial proceedings. Thus, a conflict between the judiciary and executive branch exists which the Antiterrorism and Effective Death Penalty Act (AEDPA) must permit tolling. "[I]ndicating that the reference was only to court or other adjudicative proceedings." Malcom v. Payne, supra, 281 F.3d 951, 957-959 (9th Cir. 2002).

34. The plain language of the two statutes are affirmative decrees which impose standards to inveigle judicial intervention, without due process to appellate review.

35. The high court of California in the early twentieth century advised that "A court will not undertake to decide abstract questions of law at the request of a party who shows no substantial right that can be affected by a decision either way." See Streator v. Linscott, 153 Cal. 285, 288 (1908). Plaintiff is of the belief that this is just what may have occurred in his case without any notice.

36. Clemency proceedings are not a claim or contention alleged by a party that takes such a form that the judicial power is capable of acting upon it, it has not become a case of controversy. "[C]ases and controversies are intended claims or contentions of litigants brought before the courts for adjudication by regular

1  proceedings established for the protection or enforcement of

2  rights, or the prevention, redress, or punishment of wrongs."

3  See Smith v. Adams, 130 U.S. 167, 173-74 (1889). It is evident

4  "[t]hat a state cannot authorize one of its agents to violate the

5  Constitution and laws of the United States, so a state officer

6  acting in violation of federal  law is considered stripped of his

7  official or representative character." See Nichols v. Brown, 859

8  F.Supp.2d 1118, 1135-36 (C.D. Cal. 2012).

9

10                        **THIRD CAUSE OF ACTION:**

11              **EQUAL PROTECTION DENIED WHERE PLAINTIFF TREATED**
                **LESS FAVORABLE THAN WHITE APPLICANTS WITH**
                **RESPECT TO CLEMENCY PROCEEDINGS**
12

13  37. Separate can never be equal or neutral. California has a long

14  and distinguished history of its ill-treatment of Black inmates

15  when it comes to fairness. (Johnson v. California, 543 U.S. 499,

16  505 (2005); Richardson v. Runnels, 594 F.3d 666, 671-72 (9th Cir.

17  2010); Walker v. Gomez, 370 F.3d 962, 976 (9th Cir. 2004)).

18  38. There was no legitimate reason for defendants and each of

19  them to make such distinction. Plaintiff was similarly situated

20  in material  respects to white inmate applicants. Plaintiff did

21  submit a full complete  application, including supporting

22  documentation. He did request a full review of the application's

23  merits, along with a personal interview request. [Exhibits 1, 2,

24  and 3].

25  39. For Defendant BROWN to fail to acknowledge attorney letters

26  shows intentional and arbitrary treatment of Plaintiff, plaintiff's

27  family members, who like plaintiff stem from Creole-Black ethnos.



FOURTH CAUSE OF ACTION:

**DEFENDANTS SUPERIOR COURT AND DISTRICT ATTORNEY
NOT ENTITLED TO ABSOLUTE AND QUALIFIED IMMUNITY**

40. In this instant case, the Superior Court and District Attorney do not function within the confines of their respective offices. Absolute immunity is designed to protect judicial functions; accordingly, courts have granted absolute immunity to prosecutors and judges.

41. Under state statute,   a judge or district attorney does not perform the function as a matter of law concerning clemency proceedings.  Absolute immunity does not bar or prevent a prisoner from seeking injunctive relief or attorney's fees in §1983. See Pulliam v. Allen, 466 U.S. 522, 541-44 (1084).

42. What the judge and district attorney are ask to do in clemency clearly exceeds conduct of a judge's discretion, even if the conduct is taken in the judge's judicial capacity. Likewise, what is ask of the district attorney exceeds the function of acts taken to prepare for prosecution that occur in course of role as advocate for state. Clemency is not a role designed for the input from a district attorney. Their job is complete at the conviction.

43. A prosecutor is not absolutely immune with respect to actions outside his or her role as advocate. Kalina v. Fletcher, 522 U.S. 118 (1997).

44. Penal Code sections 4803 and 4805 are not Constitutional amendments under California constitutional standards, therefore, provide no  grant of immunity to defendants.



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
35 28391

-10-

### FIFTH CAUSE OF ACTION:
### REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF

45. The facts and evidence are clear. Defendant BROWN did not entertain Plainitff's application for commutation of sentence within the "10 days" after notice was made to the district attorney and Board of Parole Hearings. See Penal Code section 4804. Neither did he entertain the application after receiving written request for interview by attorneys. Nor acknowledge plaintiff from plaintiff's last correspondence letter. Nothing was done.

46. This court has subject matter jurisdiction over parties. It is undisputed that Plaintiff's due process and equal protection rights have been duly violated.

47. Injunctive and declaratory relief are necessary for Plaintiff to have a full and fair review on each and every element of his contentions lodged in his commutation of sentence application. In that he is entitled to reduction of sentence from LWOP to 15 years to life based upon the postconviction violations that cannot be raised pursuant to 28 U.S.C. §2244(d)(2). Matters that the jury should have been entitled to know and judge under the reasonable doubt standard.

48. Defendant NEWSOM should be required to instruct his Legal Affairs Secretary to make such determinations within 90 days under 18 U.S.C. §3626(a)(2) prelimianry injunction time line, with Governor NEWSOM granting or denying within 30 thereafter with written conclusions of facts from [Exhibit 1] application.

49. That neither superior court or district attorney are permitted



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

1  to exercise the unconstitutional standards setforth by Penal Code

2  section 4803 and 4805.

3  50.   Under Article II, §2 of the United States Constitution, the

4  President is empowered to "grant reprieves and pardons for offenses

5  against the United States, except in cases of impeachment." There

6  is not a single statutory law that grants Congress, the legislature

7  or the United States District Court to weigh in on that power duly

8  granted by the Constitution.  The separation of powers are not

9  broken at the federal level.  Neither is the Attorney General of

10 the United States consulted on such Executive power rights.

11

12                          CONCLUSION

13     WHEREFORE, having fully stated its causes of action, plaintiff

14 prays for a judgment:

15          1. An order for a speedy hearing of an injunctive and

16     declaratory judgment action pursuant to Federal Rules of

17     Civil Procedure 57;

18          2. For Plaintiff's costs and attorney fees incurred in

19     bringing and prosecuting this action;

20          3. For such other relief as the court finds just and

21     equitable.

22 DATE: *3-27-19*

23

24                              Respectfully submitted,

25

26                              Henry Moses Mitchell, Jr., Plaintiff
                                In Propria Persona
27

-12-



EXHIBIT

BEFORE THE GOVERNOR OF THE STATE OF CALIFORNIA
THE HONORABLE EDMUND G. BROWN, JR.

THE CALIFORNIA BOARD OF PAROLE HEARINGS
THE HONORABLE JENNIFER SHAFFER, EXECUTIVE OFFICER

THE LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
THE HONORABLE JACKIE LACEY

In re

HENRY CEPHUS HAYES,

Applicant.

APPLICATION FOR COMMUTATION OF SENTENCE TO 15 YEARS TO LIFE

Submitted by:

                    Henry Cephus Hayes, #V16058
                    California State Prison-LAC
                    P.O. Box 4430 (A1-115)
                    Lancaster, CA 93539-4430

"CLEMENCY INVOLVES A SEARCH FOR ANSWERS
THAT GOES BEYOND JUDICIAL FACT FINDING..."

Janice Rogers Brown,
The Quality of Mercy, 40 U.C.L.A. L. Rev. 327, 335 (1992)

## INTRODUCTION

The power of commutation exists because the people recognize that, no matter how careful the attempt, the courts do not in every case achieve justice. The people have given the Governor the power and the responsibility to do justice in those cases, not through the application of a rule of law, but through the exercise of common sense, compassion, and conscience. From 1941 to 1974, the governors of California granted clemency 41 times, basing their decisions on a number of factors. These have included a lack of prior criminal record or history of violence, good education and employment records, newly discovered evidence not presented to the jury that casts doubt on the fairness of the process, recommendations for clemency by jurors who sat on the case, doubts about the defendant's guilt of the capital offense, doubts about the adequacy of the legal representation afforded the defendant at rial, and the petitioner's good adjustment to life in prison.

Henry Hayes's application is unique because it presents a very compelling case as to many of the factors above. If clemency exists because the people intended it to be exercised in the appropriate case this is that case. It would be difficult to construct one more worthy.



Governor Edmund G. Brown Jr. · State Capitol · Sacramento, California 95814

## APPLICATION FOR
## COMMUTATION OF SENTENCE

Complete this application to request a commutation of sentence from the Governor. A commutation is a reduction or elimination of a sentence. If granted, this application will become a public record, however specific personal information will be redacted (hidden) before it is made available to the public.

### APPLICANT INFORMATION

Name: HENRY CEPHUS HAYES     Date of Birth: 1/11/65     Inmate ID: #V16058

Address: P.O. BOX 4430 (A1-115), Lancaster, CA 93539-4430     Facility: CSP-Los Angeles County (LAC)

1.   Conviction Summary:

| List all prior convictions, including any in other states or countries. Attach additional pages if necessary. | | | |
|---|---|---|---|
| Offense(s): §§187(a); 187(a) | Date of offense(s): August 27, 1999 | County of conviction(s): Los Angeles | Sentence(s): [ LWOP ] |
|  |  |  |  |
|  |  |  |  |

2.   Briefly describe the circumstances of the crime(s) for which you are requesting a commutation (attach additional pages as necessary):

On the morning of August 27, 1999, my wife of ten years and our seven
year-old daughter were found murdered in the family home which we shared.
Their bodies were discovered by one of my wife's co-workers. When I left
for work that moringing they were both alive and well. When I came home

3.   Explain why you are requesting a commutation (attach additional pages as necessary):

The United States Supreme Court has announced that "[C]lemency is deeply
rooted in our Anglo-American tradition of law, and is the historic remedy
for preventing miscarriage of justice where judicial process has been
exhausted." Herrera v. Collins, 506 U.S. 390, 411-12 (1993). I am filing

4.   Provide a brief statement explaining why you should be granted a commutation (attach additional pages if necessary):

Once a defendant has been afforded a fair trial, the presumption of
innocence disappers. Being afforded a fair trial means that a defendant
is given all, not just some rights relegated to him or her under the

5.   If you have paid any money or given any gift to anyone to assist in the preparation of this application, list their name, address, and amount paid or given (required by Penal Code section 4807.2):

2a.  Briefly describe the circumstances of the crime(s) for which
     you are requesting a commutation [Continued]:

there was a large police presence covering my street and the three

residences next to my home. I parked at the last police car closest

to my ability to safely park. As I exited my vehicle and made my

way to the sidewalk, I could see crime scene tape across the front

of my residence. I did not become alarmed because there are three

separate rediences on my lot, and the situation was not within my

full understanding to speculate what had occured.

     As I approached the crime scene tape I showed my Los Angeles

Police Department Crisis Response Team identification, which permits

me to access and pass through any active crime scene to assist with

the care, comfort and counsel to any affected persons or families. As

I neared the mobile police RV, detectives came rushing out and

began questioning how I was able to make it that close to the scene.

I notified them that I was a CRT member with the department, I was

then searched, handcuffed and taken to South Bureau Homicide. I

was left in a holding cell for more than an hour. I aksed numerous

times what was going on. At no point was I ever read my Miranda

warning rights.

     Once I was removed from the holding cell, unhandcuffed and

taken to an interview-room, I spoke freely and openly with officers

still without Miranda warning rights. I granted them permission to

search my vehicle, still not nowing the situation, because I had

nothing to hide from, I had not commited any crime. I was cooperating

with the investigation, I understood their job and did not want to

hinder their duties. Whatever it was I would be quickly cleared.

     I have included the DVD of my interview and reaction when I

clearly told that, "we are investigating the death of your wife."
I immediately passed out. I was in shock to hear the death of your
wife. When I awoke, still in shock, I screamed for the presence of
my daughter. I scremed for her using her nick-name, Lammy. An
ambulance was called when detectives discovered that I had pre-existing
heart condition know as mitral valve prolaspe. The year prior I
had spent five days in the cardiac ICU at Hospital of the Good
Samaritan in downtown Los Angeles.  From the police station I was
taken to the emergency room at Brotman Hospital, treated and
released without an arrest. I called the detectives the next day
and came in for a second interview. I was interviewed and left.
The main question was whether I had heard what they said about
wife and daughter. It was determined at trial that the only thing
said was death of your wife, nothing about my daughter. However,
because no Miranda was given, the interviews were suppressed. The
jury never heard or saw my reaction to the death notification.

    I was arrested six months later. The case was based on
circumstantial evidence. No confession to the crime. No evidence
was given that made for unimpeachable or unquestionable proof of
guilt. The jury took four days to bring guilt. The same jury hung
on the issue of death.

3a.  Explain why you are requesting a commutation [Contitued]:
for two reasons: 1) I am innocent of the crimes, and 2) the rule
of law. This State and country is supposed to be derived upon the
rule of law, which implies that every person is subject to the law,
including people who are lawmakers, law enforcement officials, and
judges.

While an individual has the right to an appeal from a criminal
conviction, or the option to file other postconviction relief through
habeas corpus, no pro se litigant has been permitted to prevail
against the State during postconviction once appeals are denied.
I am filing because of my proclamation of innocence and the terms
and conditions which constitute a fair trial under the rule of law
were not honored throughout my case.

Due process of law requires that the proceedings shall be fair,
but fairness is a relative, not an absolute concept...What is fair in
one set of circumstances may be an act of tyranny in others. See
Snyder v. Massachusetts, 291 U.S. 97, 116-117 (1934). Conversely,
"as applied to a criminal trial, denial of due process is the failure
to observe rights essential to the very concept of justice. In order
to declare a denial of it.. the Court must find that the absence
of that fairness fatally infected the trial; the acts complained
of must be of such quality as necessarily prevents a fair trial." See
Lisenba v. California, 314 U.S. 219, 236 (1941).

There has not been a single court in the State of California
to permit a pro se litigant convicted and serving time to prevail
on postconviction.  The resources of wrongful conviction grip on
the edge of limited space and time. Organizations, institutions, and

-7-

schools dedicated to the wrongfully convicted may take a case that has little merit, or deny one that has greater merit. It is a call of the dice whether ones' case may be selected for consideration. Not every case today relies on DNA evidence. Mine was not. Even when an inmate is represented by one of the wrongful conviction groups, it remains difficult to bring a resolution without in most cases the defendant accepting guilt in the face of freedom. My case has been submitted to many groups without acceptance. I have done my personal bset to show that I am not the person who shot the shots that killed my wife and daughter. I am not aware of who could have done this horrendous crime.

I held out hope and confidence in the rule of law to overturn my conviction. In 2010, I was granted an evidentiary hearing for purposes of discovery of materials not turned over by the people. During the hearing of July 23, 2010 [Exhibit A]. I was pro per in proceedings. The trial judge assumed, that all of thw witnesses were the prosecutor's. Upon finding that I was the person who subpoena'd the witnesses and supporting documents for the hearing, the atmosphere quickly changed.

It was my position to bring out the facts discovered through previous reading of my trial file that was provided to my counsel. The research into the time of death was highly questionable at trial. But what was not brought out counsel, was brought out by me. The medical examiner's office had destroyed the biological materials some three years before I went on trial. Neither did the reveal to counsel any of the testing or work done by the medical examiner. Trial counsel was never made aware of any of the materials obtained

by applicant, nor were disclosed by the prosecutor. [Exhibit B].

The destruction of the biological materials were destroyed outside of the statutory principles held in Penal Code section 1417.9, subdivision (a): which says in relevant part, "[t]he appropriate government entity shall retain all biological material that is secured in connection with a criminal case for the period of time that any person remains incarcerated in connection with that case." The Los Angeles County Department of the Coroner destroyed the critical biological three years before trial, never disclosed the testing results, or raw notes of personnell task with the evidence handling. The department policy was destroy within one year on a homicide case. I was arrested in in custody at the time of destruction. This should have been made known to counsel. The rule of law failed to protect this critical biological evidence.

The biological evidence could have been tested, if it was still available. The testimony from the medical examiner in the case. who did not have the skill or knowledge to perform a multiple regression formula test on the material. Which has a more definitive window into the time of death findings.  He even made a "guess" at the tectal tempature that was never taken to come up with his time of death estimation. That was not told at the time of trial, it was brought out during the July 23, 2010 hearing. The vitreous humor fluid that was destroyed, was in all accounts liken to DNA material. Material that could have been tested long after the crime had occured. Must I suffer in all fairness from the actions of the State? In fairness, should I lose the benefit of freedom? This is information that was not presented to the jury at the time of trial.

When an in-custody inmate made the allegation that I wanted to hire him to kill witnesses, I lost the advantage and benefit of Douglas Goldstein. A conflict was declared and I was appointed new trial counsel. The truth was that I had not even spoken to him about such a matter, he did attend the bible studies I was conducting. On July 27, 2010 [Exhibit C], I was able to obtain the information that brought forth the truth as to why witness funds were paid.

The jail house informant, Andrew Willis, was not incarcerated until many months after the original funds were paid. The funds were paid March 15, 2000. Douglas Goldstein was not relieved and new counsel appointed until the summer of 2002.More than two years had gone by. As review of the [Exhibit D] documents will show that there was never a threat when the funds were paid out [Ex. D, Witness Protection Request, Question .5]. It is my position it was a disingenuous move to remove dedicated counsel advocating for my innocence. Even the prosecutor perjured himself [Exhibit E], in this undated declaration submitted after the July 27, 201 hearing. The funds were paid long before Andrew Willis made his claim to obtain a more favorable deal, when he was facing 25-years to life for assault on a police officer, that was dropped when he came forth with the claim, and was impeached at the penalty pahse of the case. The prosecutor cannot uphold that Willis came into the system within 90 days of my arrest, which is when the funds were paid out. It is a violation of the rule of law, and should be palced against the State not this applicant, who sought the truth to why he lost a strong advocate in Douglas Goldstein.

In October 2015, I was granted a second postconviction evidentiary hearing. [Exhibit F].

There was missing from my trial counsel's files and the files turned-over to me, witness statements made by prosecution witness Francesca Woods. And insurance documents that were never turned-over by the prosecution. [Exhibit G].

The trancripst of the 2 and 22 of October 2015, show that trial counsel did not have, and was not given witness statements or the additional insurance documents. He advised the court that no defense investigation was done with respect to Ms. Woods [Exhibit F, page 13:18-21]. The other issue was the insurance documents. In [Exhibit F, pg 14: 16-27], counsel advised the discovery court that "there was evidence that we had before the trial that was turned over by the people with respect to a claim, or an inquiry that Mr. Hayes made with regard to that policy. It was a one-time inquiry." The prosecution drove home that that one-time inquiry, where I was attempting to cover funeral arrangements, was motive for murder. Trial counsel advised the the defense did not have the full and fair disclosure of the insurance process and being paid to others, not to myself. [Exhibit F, pg. 14:21-27][Exhibit G]. Disclosures were not made to the defense on many matters related or required as mandated my Penal Code statute. [Exhibit F, pg. 17:7-12]. Trial counsel did state the negative impact that such non-disclosure had on the defense investigation. [Exhibit F, pg. 17:21-18:3], supoenas could have been issued to determine the truth. The prosecution did not affirm that disclosure was made, just that the circumstances of the alledge relationbship were well known.

Beyond the written statement by DA investigators, there is
nothing that points to an affirmation that is unimpeachable. I
told the court and my counsel on numerous occasions, I never meet
Francesca Woods. [Exhibit F, pg. 18:23-19:14]. Facts that were not
challenged at trial, facts that were not investigated by trial counsel.
Facts that remain a mystery as to when Ms. Woods was incarcerated.
As to when and how she contacted me to tell me that she was in
jail. That is not in her statement or proven by the prosecution.
Her knowledge of me is and was suspect, but not explored.   This
drug using prostitute was not a sexual experience I had.

A review of all of the postconviction proceedings lead off
with the prosecution stating that the defense knew about the issue
under contention. I have provided declaration from my trial counsel
that contradict the prosecution's version of events.

As I made in my second point of why I am requesting a
commutation, it is the violations of the rule of law that the
Governor has the power and the responsibility to do justice where
the rule of law has failed. Postconviction proceedings have brought
to light critical issues that the jury should have been entitled
to hear and make determination upon such matters. It was evidence
that I did not have the due process of law, nor a fair trial on
the merits that were concealed by the prosecution as exhibited
in the attached supporting documents.

I was not afforded the right to bilogical material akin to
DNA that could have been tested and utilited to prove my innocence.
The jury did not hear my interviews with police. The rule of law,
where must one stand to be granted all its beneficial enjoyments.

-12-

It was said that I pawned my wife's wedding ring, I did. But the truth of why was never given to the jury. My trial counsel had the truth, but did not call the staff of Tiger Federal Credit Union in Culver City gave all of the money in our savings account to my in-laws without my authorization, and all of the money in my wife's checking account. That information was never told to the jury. The ring was not on her finger when she died, it was left in jewelry solution in the bathroom, because she would lose diamonds from the setting. That was shown at trial.

I was not the shooter or the cause of death for my family. I do maintain my innocence. However, to address my flawed character of infidelity against my wife. To begin with, I never denied to my wife the relationships I had with other women. I include with this application the tape recording of my wife the Monday before her death.

In it she is expressing her understanding of where our marriage and relationship was headed. She was positive about the state of our conversations. I never gave my wife any expressed anger that she was at fault, or was to blame for my behavior. I made certain that she understood that while I knew she personally felt rejected, or her desireableness questioned, it was my own struggle.

I was driven by opportunistic infidelity, my feelings of guilt behind it faded as the comfort of success rose. During the summer of 1999. My opportunistic infidelity spiraled into conflicted romantic infidelity (experience of genuine love and sexual desire for more than one person at a time.) In all of my attempts to have

-13-

an exit strategy to end the relationship with Ms. Byther, my wife went through my well kept records of household operations, finding the toll calls to Ms. Byther's home. She phoned and left a message on Ms. Byther's voice-mail. Ms. Byther played the message for me, I denied have any knowledge of the caller. I advised her to call the person back. That is how the relationship ended. I knew that both women would speak. That resolved me having to use an exit plan with Ms. Byther.

At that point in my life and marriage, I had only to deal with Ms. Quinn, the mother of my now 18 year-old daughter, Leizelle. It was determined that Ms. Quinn would be moved to the City of Bellflower to live. That she would be provided with child support, but that the visitation would be at my sole discretion and on my sole terms. It was not intention to impregnate Ms. Quinn, it was purely sexual. Ms. Quinn became pregnant to prevent any loss in connection with me. I have maintained a very strong relationship with my daughter Leizelle.

The benefit I thought I was gaining to justify my infidelity was from my theological perspective of fornication versus adultery. From theology none of the women were married. Without them being legally married, there was no adultery under the biblical standards. If I was to sin it was against my own body. I was not truly rational in my thinking. I can not now in good conscience justify my sexual behavior during that time in my life.

It would not have made any reeasonable sense to kill Vangela and Teanna. With Ms. Byther, I would still have a wife and daughter. With Ms. Quinn, I still would have a wife and daughter. I don't think the theory of these were weighed by the jury.

4. Provide a brief statement explaining why you should be granted
   a pardon or commutation [Continued]:

United States Constitution.

Wrongful convictions happen in numerous forms. Obtaining any
type of relief from such convictions are rare for a sole pro se
inmate litigant to win. Was the judicial system designed to permit
incarcerated inmate on postconviction to gain relief? Does the
rule of law favor due process in post-conviction proceedings?
My request to be granted commutation is based on my proclamation
of innocence. If only the vitreous humor fluid had not been
destroyed. I am hopeful that the fundamental fairness upon review
of my total application merits consideration. At this point in
my life, clemency is the only remaining hope I possess. As shown
above, I have diligently fought to undo what I know that I did not
do on August 27, 1999.

With all my efforts and soundness of claims raised on and
through postconviction courts, the rule of law did not prevail
against due process for the losses in bilogical materials and
documentary evidence being withheld.

I have no prior felony convictions before this case. I have
never used drugs or tasted alcohol. I have never participated
in gangs or gang activity. After the family domestic call with
my first wife, which led the me using my hands on her, I filed
for divorce. I could not turn into my step father. I grew up in a
highly abusive home. I was brutally beaten. Even seeing my mother
beaten, I could not with that wife repeat that madness. Growing
up in foster care saved me from domestic violence. Through all
of my childhood set backs, being born to a 15 year old unwed mother.

-15-

Having a father & his family disowning me. My mother and step-father, robbing me of my $142,000.00 inheritance. Taking care of a wife and baby at 19, who was 16 years old when we married. Supporting a growing family, along with other family members, took a toll. The domestic violence incident was the breaking point in my life. It broke me to the point I had suicide attempts. Through it all I graduated Culver City High School. Graduated Barclay College in a diploma in Paralegal Studies. Graduated International Seminary, and Southwest Bible College with a Bachelor of Arts degree.

I have been a model prisoner while incarcerated. My only RVR 115 was due to a mass disruption at High Desert. I was in the cell with a gang member who participated with the incident. My violation was changed to disobeying a direct order of a peace officer when I told the hearing officer that being in the cell with a gang member was not right, I had no choice but not to move for fear of harm to mysaelf. I had seen numerous stabbings, I chose the 115. I have not been housed with active gang members, since. As an LWOP, I have negative points, it is the mandated 19 points, that puts me at Level II.

These 18 years have been an experience. It let me see how cold hearted my mother really was. Refusing to testify at the penalty phase, all to preserve her dignity from having to account for my abuse, her prison terms in two states, her drug use and negative lifestyle. Not even to ask the jury to spare my life.

As an ordained minister, I fear God, and held on to my faith. People testified that my faith in God was genuine. My

-16-

conduct in county jail showed that. I remained teaching bible study, counseling inmates, and stopping suicides of other inmates.

I don't have the prison officials providing me with support. I don't have letters from organizations or family members. I felt the I needed to deal with this matter on my own merits. I hope and pray that the criteria on executive review weighs the same as a review to grant parole. Meaning that the Governor cannot require an inmate to agree with or adopt the official version of a crime in order to demonstrate insight or remorse. (In re Sanchez (2012) 209 Cal.App.4th 962, 972 ("Sanchez"); In re Twinn (2010) 190 Cal.App.4th 447, 466 ("Twinn").) Similarly, the Governor cannot rely on an inmate's refusal to admit guilt as evidence that the inmate lacks insight and credibility. (In re Swanigan (2015) 240 Cal.App4th 1, 16; In re Jackson (2011) 193 Cal.App.4th 1376, 1390.)

For the last 15 years I have maintained a healthy marriage to my wife, Deborah. I have maintained healthy relationships with my adult children and all 14 of my grandchildren. I am blessed to have financial resources most inmates did not develop before being incarcerated. With marketable skills for employment opportunites, I feel very confident in being able to reintergrate back into society quickly and seamlessly.

With my certificate in domestic violence has helped me heal from years of abise during my childhood, and understand triggers to prevent such violence.

Respectfully submitted,

Henry Cephus Hayes, Applicant

## NOTICE OF INTENT TO APPLY FOR EXECUTIVE CLEMENCY
*This notice is required by Penal Code sections 4804 and 4805.*

To the District Attorney of ___LOS ANGELES___ County: Please take notice that I, ___HENRY CEPHUS HAYES___ ,

was convicted of the crime of ___MURDER___ [Superior Court Case No. BA197149] ,

committed in ___LOS ANGELES___ County, California, on the date of ___08/27/1999.___ .

I will submit this application to the Governor of the State of California.

_____
Applicant's Signature

December 27, 2017
Date

## DISTRICT ATTORNEY ACKNOWLEDGEMENT
*This section to be completed by the District Attorney only.*

I, _____ , District Attorney of the County of _____ ,

do hereby acknowledge receipt of notice from _____ ,

that he/she intends to apply to the Governor of the State of California for a commutation of sentence.

Signed _____

Date _____

*District Attorney: Please Return this Notice to the Governor's Office, Attn: Legal Affairs, State Capitol, Sacramento, CA 95814.*

## STATEMENT OF NOTICE TO DISTRICT ATTORNEY AND DECLARATION UNDER PENALTY OF PERJURY

This application may be submitted to the Board of Parole Hearings for investigation and recommendation pursuant to Penal Code section 4812. This application may also be submitted to law enforcement or other agencies for investigation or recommendation.

Penal Code sections 4804 and 4805 require that you give the District Attorney in the county of conviction written notice of your intention to apply for a commutation. You must complete the Notice of Intent to Apply for Executive Clemency (attached) and mail it to the District Attorney before submitting this application to the Governor's Office.

I, HENRY CEPHUS HAYES , declare under penalty of perjury under the laws of the State of California that I
(Print Full Name)
have served the District Attorney of the County of LOS ANGELES with notice of my intent to apply for a
(Name of County*)
commutation.

I further declare under penalty of perjury under the laws of the State of California that the information I have provided on this application is true and correct. I understand that any omission or misstatement of facts may result in the denial of the application and the filing of perjury charges against me.

_____                    December 27, 2017
Applicant's Signature                                         Date

*If Applicable, List Additional Counties Here (Send Notice of Intent to Apply for Executive Clemency to All Counties Listed)

ORIGINAL

COMMUTATION EXHIBIT LIST

In re HENRY CEPHUS HAYES, Applicant

[EXHIBIT A]

POSTCONVICTION PROCEEDING TRANSCRIPTS FOR JULY 23, 2010

[EXHIBIT B]

TRAIL COUNSEL DECLARATION FOR FACTS OF JULY 23, 2010

[EXHIBIT C]

POSTCONVICTION PROCEEDING TRANSCRIPTS FOR JULY 27, 2010

[EXHIBIT D]

SUBPOENA'D RECORDS OF WITNESS PROTECTION FUNDS

[EXHIBIT E]

DECLARATION OF PROSECUTOR ROBERT GRACE ON WITNESS FUNDS

[EXHIBIT F]

POSTCONVICTION PROCEEDING TRANSCRIPTS OCTOBER 2 and 22, 2015

[EXHIBIT G]

TRIAL TRANSCRIPTS OF COUNSEL EXAMINATION AND INSURANCE
DOCUMENTS OBTAINED ON POSTCONVICTION BY APPLICANT



EXHIBIT

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3   DEPARTMENT NO. 110          HON. LANCE A. ITO, JUDGE

4

5

6

THE PEOPLE OF THE STATE OF CALIFORNIA,)
7                                     )
                          PLAINTIFF,  )
8                                     )
                  VS.                 )   NO. BA197149
9                                     )
   HENRY CEPHUS HAYES,                )
10                                    )
                          DEFENDANT.  )
11   _____ )

12

            REPORTER'S TRANSCRIPT OF PROCEEDINGS
13                   JULY 23, 2010
               PAGES 1 - 30, INCLUSIVE
14

15

   APPEARANCES:
16

17   FOR THE PEOPLE:     STEVE COOLEY, DISTRICT ATTORNEY
                         BY:  ROBERT GRACE, DEPUTY
18                       210 WEST TEMPLE STREET
                         18-000 FOLTZ CRIMINAL JUSTICE
19                       CENTER
                         LOS ANGELES, CALIFORNIA  90012
20
   FOR THE DEFENDANT:  IN PROPRIA PERSONA
21

22

23

24

25

26

27   COPY
                         JANET M. MOXHAM, CSR #4855
28                       OFFICIAL REPORTER

G

M A S T E R   I N D E X
JULY 23, 2010

CHRONOLOGICAL AND ALPHABETICAL INDEX OF WITNESSES

| DEFT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GUTSTADT, JEFFREY | 4 | 11 | 15 | |
| MUTO, JOSEPH JOHN | 18 | 20 | 23 | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBITS

| DEFENSE EXHIBITS | FOR IDENTIFICATION PG.   VOL. | IN EVIDENCE PG.   VOL. |
|---|---|---|
| A - CURRICULUM VITAE | 4   1 | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| PEOPLE'S EXHIBITS | FOR IDENTIFICATION PG.   VOL. | IN EVIDENCE PG.   VOL. |
|---|---|---|
| 1 - LABORATORY RESULTS REPORT | 14   1 | |

CHRONOLOGICAL AND ALPHABETICAL INDEX OF WITNESSES

NONE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBITS

NONE

G 1

1  CASE NAME:             PEOPLE VS. HENRY CEPHUS HAYES

2  CASE NUMBER:           NO. BA197149

3  LOS ANGELES, CA.       JULY 23, 2010

4  TIME:                  9:00 A.M.

5  DEPARTMENT 110         HON. LANCE A. ITO, JUDGE

6  REPORTER:              JANET M. MOXHAM, CSR #4855

7  APPEARANCES:

8                    THE DEFENDANT BEING

9                    PRESENT, APPEARING IN

10                   PROPRIA PERSONA; ROBERT

11                   GRACE, DEPUTY DISTRICT

12                   ATTORNEY FOR LOS ANGELES

13                   COUNTY, REPRESENTING THE

14                   PEOPLE OF THE STATE OF

15                   CALIFORNIA.

16

17                       --oOo--

18

19     THE COURT:  IN THE HAYES MATTER, MR. HAYES IS

20  PRESENT BEFORE THE COURT, ALSO PRESENT IS MISS POLEN,

21  WHO WAS ONE OF HIS TRIAL COUNSEL, PEOPLE REPRESENTED

22  BY MR. GRACE.

23           MR. GRACE, YOU'VE GOT WITNESSES ALL LINED

24  UP READY TO CALL?

25     MR. GRACE:  WELL, THOSE -- ACTUALLY, THOSE

26  WITNESSES WERE SUBPOENAED BY MR. HAYES, DR. --

27     THE COURT:  GUTSTADT?

28

G2

1          MR. GRACE:  MR. MUTO FROM THE L.A. COUNTY

2     CORONER'S OFFICE IS HERE.  ALSO, WITNESSES SUBPOENAED

3     BY MR. HAYES FROM THE L.A. COUNTY DISTRICT ATTORNEY'S

4     OFFICE, D.A. INVESTIGATORS WHO BROUGHT DISCOVERY THAT

5     WAS SUBPOENAED BY MR. HAYES THAT HAS IDENTIFYING

6     INFORMATION IN IT.

7               AND SO WE WANT TO COMPLY WITH THE SUBPOENA,

8     BUT WE'VE ASKED TO HAND THOSE ITEMS OVER TO THE COURT,

9     AND THE COURT CAN DIRECT US AS TO WHAT CAN BE REDACTED

10    AS PART OF THAT DISCOVERY.

11         THE COURT:  WHAT ARE YOU SUGGESTING BE REDACTED?

12         MR. GRACE:  ANY IDENTIFYING INFORMATION,

13    INCLUDING DRIVER'S LICENSE, SOCIAL SECURITY NUMBER AND

14    ADDRESSES AND TELEPHONE NUMBERS.

15         THE COURT:  AND HOW VOLUMINOUS IS THIS MATERIAL?

16         MR. GRACE:  IT'S NOT -- IT'S PAGES, LESS THAN 20

17    PAGES.

18         THE COURT:  SO THIS IS SOMETHING THAT MY -- ONE

19    OF MY LAW CLERKS COULD ATTEND TO?

20         MR. GRACE:  YES.  BECAUSE WHAT I BELIEVE IS

21    WHAT -- NOT TO SPEAK FOR MR. HAYES, BUT WHAT HE WANTS

22    IS THE FACT THAT THE -- WHAT FUNDS ARE PAID, AND SO

23    THOSE AMOUNTS ARE THERE, AND TO WHO IT WAS PAID FOR

24    AND WHAT IT WAS PAID FOR.

25         THE COURT:  WELL, LET'S DO THAT.  WHY DON'T WE --

26    LET'S GET DR. GUTSTADT OUT OF HERE.  I KNOW

27    DR. GUTSTADT HAS PROBABLY THREE AUTOPSIES YET TO DO

28    THIS MORNING.

G3

1               SO, DR. GUTSTADT, COME ON UP.

2

3                     JEFFREY GUTSTADT,

4

5    CALLED AS A WITNESS BY THE DEFENDANT, WAS SWORN AND

6    TESTIFIED AS FOLLOWS:

7         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

8    SWORN.

9               DO YOU SOLEMNLY STATE THAT THE TESTIMONY

10   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS

11   COURT, SHALL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING

12   BUT THE TRUTH, SO HELP YOU GOD?

13        THE WITNESS:  I DO.

14        THE CLERK:  PLEASE BE SEATED IN THE WITNESS

15   STAND.

16               STATE AND SPELL YOUR FULL NAME FOR THE

17   COURT RECORD.

18        THE WITNESS:  MY NAME IS JEFFREY, J-E-F-F-R-E-Y,

19   GUTSTADT, G-U-T-S-T-A-D-T.

20        THE COURT:  DR. GUTSTADT, GOOD MORNING.

21        THE WITNESS:  GOOD MORNING.

22        THE COURT:  MR. HAYES.

23        MR. HAYES:  YES.

24

25

26

27

28

G4

```
 1                    DIRECT EXAMINATION

 2

 3   BY MR. HAYES:

 4        Q     GOOD MORNING, DR. GUTSTADT.

 5        A     GOOD MORNING.

 6        MR. HAYES:  IF I COULD JUST HAVE THIS NOTICE AS

 7   DEFENSE FOR IDENTIFICATION.

 8        THE COURT:  WHAT IS THIS, MR. HAYES?

 9        MR. HAYES:  THAT IS THE CURRICULUM VITAE THAT HAS

10   HIS NOTATION ON THE BOTTOM.

11        THE COURT:  GOT IT.

12             BE MARKED AS DEFENSE EXHIBIT A FOR PURPOSES

13   OF THIS HEARING.

14

15             (DEFT'S A FOR ID  =

16              CURRICULUM VITAE)

17

18     MR. HAYES:  THANK YOU, YOUR HONOR.

19        Q     DR. GUTSTADT, YOU'VE BEEN HANDED WHAT'S

20   BEEN IDENTIFIED AS DEFENSE EXHIBIT A.

21             DO YOU RECOGNIZE THAT DOCUMENT?

22        A     YES.

23        Q     ON THE VERY BOTTOM OF THAT DOCUMENT IS

24   NOTES.  CAN YOU TELL ME ON OR ABOUT WHEN YOU MADE

25   THOSE NOTES?

26        A     I CANNOT RECALL EXACTLY WHEN I MADE THOSE

27   NOTES.

28
```

G5

1      Q     WERE THOSE NOTES THAT YOU MADE ON THAT
2   DOCUMENT PART OF YOUR ORIGINAL AUTOPSY REPORT?
3      A     NO.
4      Q     THEY WERE NOT DISCLOSED TO THE PROSECUTION?
5      A     UH, I DON'T RECALL WHETHER THEY WERE
6   DISCLOSED TO THE PROSECUTION.
7      Q     SO NONE OF THAT INFORMATION WAS DISCLOSED.
8            CAN YOU TELL --
9      MR. GRACE:  OBJECTION, YOUR HONOR.
10     THE COURT:  SUSTAINED.
11     MR. GRACE:  ASSUMES A FACT NOT IN EVIDENCE.
12     THE COURT:  WELL, THERE'S NO ANSWER THAT SUPPORTS
13  THAT.  IT'S A QUESTION.  SO IF YOU WANT TO OBJECT, BE
14  MY GUEST.  BUT I UNDERSTAND WHAT IT MEANS.
15          NEXT QUESTION.
16     Q     BY MR. HAYES:  CAN YOU EXPLAIN TO THE COURT
17  WHAT THAT NOTATION IS ON THE BOTTOM OF THAT DOCUMENT?
18     A     THIS IS, IN THESE NOTES, I PLUGGED IN A
19  FORMULA FOR THE DETERMINATION OF THE POST-MORTEM
20  INTERVAL USING THE VALUE OF THE POTASSIUM LEVEL IN THE
21  VITREOUS HUMOR.
22     Q     WHAT WAS YOUR FINDING WITH USE OF THAT
23  POTASSIUM ONLY FORMULA?
24     A     THAT THE POST-MORTEM INTERVAL BETWEEN THE
25  TIME THAT THE VITREOUS HUMOR WAS COLLECTED AT TIME OF
26  AUTOPSY, GOING BACK TO THE TIME OF DEATH, ACCORDING TO
27  THE FORMULA, WOULD HAVE BEEN APPROXIMATELY 5.21 DAYS.
28

G6

1      Q    OKAY.

2          SO IN THAT -- USING JUST THE POTASSIUM ONLY

3  FORMULARY, ARE YOU AWARE OF ANY TEXTBOOKS THAT SAYS

4  THAT POTASSIUM ONLY IS NOT A VALID USE?

5      A    YES.

6      Q    HAVE YOU EVER DISCOVERED ANY OTHER TEXTS

7  THAT USE A MULTIPLE REGRESSION FORMULA?

8      A    I DON'T KNOW.

9      Q    YOU'VE NEVER STUDIED THE COURSE ON DR. JOHN

10  COY OF MULTIPLE REGRESSION FORMULA?

11      THE COURT:  SLOW DOWN.

12      MR. HAYES:  SORRY, SIR.

13      Q    YOU'VE NEVER STUDIED DR. JOHN COY ON THE

14  USE OF MULTIPLE REGRESSION FORMULA AS IT RELATES TO

15  THE USE OF VITREOUS FLUID?

16      A    I HAVE NOT.

17      Q    AND YOU HAD AN OPPORTUNITY TO BE

18  INTERVIEWED BY A PROSECUTOR INVESTIGATOR ON OR ABOUT

19  JUNE 10TH OF THIS YEAR?

20      A    YES.

21      Q    AND YOU EXPLAINED TO THAT INVESTIGATOR THAT

22  IF THAT VITREOUS HUMOR WAS STILL AVAILABLE, THAT THAT

23  FLUID COULD STILL BE TESTED; IS THAT CORRECT?

24      A    I BELIEVE I SAID THAT IF THE VITREOUS HUMOR

25  HAD BEEN AVAILABLE, THEN IT COULD BE TESTED.

26      Q    SO THAT BEING THE CASE, WERE YOU AWARE OF

27  ANY REQUIREMENTS THAT YOU HAVE TO RETAIN SUCH FLUIDS

28  FOR VERIFICATION OF YOUR FINDINGS?

G7

1        A      THERE ARE REGULATIONS ESTABLISHED BY THE

2   CORONER'S OFFICE REGARDING THE RETENTION OF THESE

3   FLUIDS.  YOU WOULD HAVE TO ASK THE DIRECTOR OF

4   LABORATORIES OR SOMEONE IN THE LABORATORY ABOUT THAT

5   INFORMATION.

6        MR. HAYES:  YOUR HONOR, I WOULD LIKE TO POST FOR

7   JUDICIAL NOTE ON 451 OF THE EVIDENCE CODE, GOVERNMENT

8   CODE SECTION 27491.4, SUBDIVISION (A).

9        THE COURT:  OKAY.

10       MR. HAYES:  WITHIN THAT DOCUMENT --

11       THE COURT:  WHICH ONE?  DEFENSE A?

12       THE CLERK:  IS THIS DEFENDANT'S A?

13       MR. HAYES:  THIS IS DEFENDANT'S B.

14       THE COURT:  IF YOU ARE CITING THE GOVERNMENT CODE

15   TO ME, YOU DON'T NEED TO MARK IT AS AN EXHIBIT.

16       MR. HAYES:  NO.  NO.  I WAS JUST GIVING YOU A

17   COPY FOR REFERENCE.

18       THE COURT:  I'VE ALREADY GOT IT.  THANK YOU.

19       MR. HAYES:  THANK YOU.

20       Q      OKAY.

21            DOCTOR, WITHIN THAT GOVERNMENT CODE, IT

22   STIPULATES THAT THE CORONER SHALL RETAIN ONLY THOSE

23   TISSUES OF THE BODY REMOVED AT THE TIME OF AUTOPSY AS

24   MAY BE NECESSARY AND ADVISABLE TO THE INQUIRY INTO THE

25   CASE OR FOR THE VERIFICATION OF HIS OR HER FINDINGS.

26            WERE YOU AWARE OF THAT?

27       A      YES.

28

G8

```
 1        Q     SO KNOWING THAT YOU WERE OBLIGATED TO

 2   MAINTAIN THOSE FLUIDS, THEY WERE STILL DISCARDED

 3   NONETHELESS?

 4        MR. GRACE:  OBJECTION.  ASSUMES FACTS NOT IN

 5   EVIDENCE.

 6        THE COURT:  SUSTAINED.

 7        Q     BY MR. HAYES:  KNOWING THAT THE FLUID --

 8   KNOWING THAT YOU HAD AN OBLIGATION TO --

 9        THE COURT:  EXCUSE ME.

10            DOCTOR, DID YOU PERSONALLY DISCARD THESE

11   SAMPLES?

12        THE WITNESS:  NO.

13        THE COURT:  NEXT QUESTION.

14        Q     BY MR. HAYES:  DOCTOR, IF KNOWING THAT YOU

15   HAD AN OBLIGATION UNDER THIS GOVERNMENT CODE, DID YOU

16   MAKE ANY REFERENCE TO ANYONE IN YOUR OFFICE TO RETAIN

17   THOSE SAMPLES?

18        MR. GRACE:  AGAIN, YOUR HONOR, I'M OBJECTING TO

19   THE FORM OF THE QUESTION AS ASSUMES A FACT --

20        THE COURT:  SUSTAINED.

21        Q     BY MR. HAYES:  SO, DOCTOR, IF I WERE TO

22   SHOW YOU A MULTIPLE REGRESSION FORMULA THAT INCLUDED

23   NOT ONLY THE VITREOUS FLUID OF THE POTASSIUM, THE

24   SODIUM POTASSIUM, AND YOU WERE TO SEE THAT IT MADE A

25   VALUE DIFFERENCE IN THAT, WOULD YOU CHANGE YOUR

26   OPINION TODAY?

27        A     NO.

28
```

G9

1     Q     EVEN BASED ON THE MEDICAL CERTAINTY OF THE

2  FACTS?

3     THE COURT:  THAT'S AN UNINTELLIGIBLE QUESTION.

4     MR. HAYES:  LET ME REPHRASE IT, YOUR HONOR.

5     Q     KNOWING THAT -- STRIKE THAT.

6     IF YOU WERE GIVEN -- YOU USED A POTASSIUM

7  ONLY FORMULARY, CORRECT?

8     A    I DID CALCULATE THE VITREOUS POTASSIUM FOR

9  THE TWO CASES.  HOWEVER, I DID NOT USE THE RESULTS IN

10  COMING TO A CONCLUSION CONCERNING THE POSTMORTEM

11  INTERVAL.

12     Q    AND AGAIN, YOU DID NOT PUT THAT INFORMATION

13  IN THE AUTOPSY REPORT?

14     THE COURT:  WE'VE ALREADY ASKED THAT QUESTION.

15     MR. HAYES:  ASKED AND ANSWERED.  YES, YOUR HONOR.

16     Q    AGAIN, DONE UNDER GOVERNMENT CODE SECTION

17  27491.4, SUBDIVISION (A), IT REQUIRES -- IT STATES IN

18  PART THAT ANY NEGATIVE FINDINGS, BOTH POSITIVE AND

19  NEGATIVE, SHALL BE INCLUDED IN THE MEDICAL REPORT.

20     WERE YOU AWARE OF THAT OBLIGATION?

21     A    NO, I WAS NOT.

22     Q    WERE YOU AWARE THAT YOU HAD A REQUIREMENT

23  UNDER STATE LAW TO INCLUDE ALL YOUR WITNESS SUBPOENA

24  AND CONCLUSIONS THAT NEEDED TO BE INCLUDED IN THE

25  REPORT?

26     A    I INCLUDED THE CONCLUSION.  I -- EXCUSE ME.

27  I DON'T BELIEVE THAT ANY OF MY CONCLUSIONS THAT I HAVE

28  COME TO CONCERNING THE POSTMORTEM INTERVAL WERE

1    INCLUDED WITHIN THE FINAL DICTATED REPORT.

2         THE COURT:  NEXT QUESTION.

3         Q    BY MR. HAYES:  SO IN OTHER WORDS, YOU ONLY

4    INCLUDED WHAT YOU FELT WAS RELEVANT FOR THE

5    PROSECUTION OF THIS CASE?

6         A    I INCLUDED THE FINDINGS OF CAUSE AND MANNER

7    OF DEATH, WHICH IS THE REQUIREMENT OF THE CORONER

8    UNDER THE LAWS, AND I PROVIDE THE CAUSE AND MANNER OF

9    DEATH, AS WELL AS THE PERTINENT ANATOMIC FINDINGS IN

10   MY REPORT.

11        Q    BUT AGAIN, ONCE AGAIN, DOCTOR --

12        THE COURT:  NO.  NO.  "BUT ONCE AGAIN" IS ASKING

13   THE SAME QUESTION.

14        MR. HAYES:  SAME QUESTION AGAIN.  YES, YOUR

15   HONOR.

16        THE COURT:  ANYTHING ELSE FOR THE DOCTOR?

17             THE DOCTOR HAS TESTIFIED HE USED THE SINGLE

18   ELEMENT TEST AND THAT THAT WASN'T INCLUDED IN HIS

19   FINAL WRITTEN REPORT, AND THAT TO HIS KNOWLEDGE, THESE

20   SAMPLES HAVE BEEN DESTROYED.

21             ANYTHING ELSE YOU NEED TO ESTABLISH FOR THE

22   PURPOSE OF YOUR MOTION?

23             AND ALSO, THAT HE WAS UNAWARE OF THE TRIPLE

24   ELEMENT TESTING PROTOCOL.

25             ANYTHING ELSE?

26        MR. HAYES:  NO, YOUR HONOR.

27        THE COURT:  MR. GRACE, DO YOU HAVE ANY

28   CROSS-EXAMINATION OF DR. GUTSTADT?

G11

1          MR. GRACE:  YES, YOUR HONOR.   JUST BRIEFLY.

2

3                    CROSS-EXAMINATION

4

5     BY MR. GRACE:

6          Q     DR. GUTSTADT, WERE YOU THE CORONER THAT

7     PERFORMED AUTOPSIES ON TEANNA HAYES AND VANGELA HAYES?

8          A     YES.

9          Q     AND AS PART OF THAT, WERE YOU ASKED TO GIVE

10    AN ESTIMATE TO TIME OF DEATH AS TO EACH OF THESE

11    VICTIMS?

12         A     I WAS ASKED BY -- I WAS ASKED TO GIVE A

13    ROUGH ESTIMATE OF THE POSTMORTEM INTERVAL, AND I

14    DISCUSSED THE CASE WITH THE CHIEF MEDICAL EXAMINER

15    CORONER, AND TOGETHER, WE CAME TO A ROUGH ESTIMATE

16    RANGE OF THE -- INVOLVING THE POSTMORTEM INTERVAL.

17         Q     AT THE TIME OF THESE AUTOPSIES, WHAT WAS

18    THE CORONER'S STANDARD PRACTICE FOR DETERMINING

19    POSTMORTEM INTERVAL?

20         A     WE USED IN THIS CASE A COMBINATION OF

21    INFORMATION RECEIVED FROM PEOPLE WHO WERE AT THE

22    SCENE, PLUS EVALUATION OF RIGOR MORTIS, CONDITION OF

23    THE BODY ON EXAMINATION BY THE INVESTIGATOR, AS WELL

24    AS -- AS WELL AS A NOMOGRAM PROVIDED BY THE CORONER'S

25    OFFICE FOR ESTABLISHING POSTMORTEM INTERVAL, USING THE

26    AMBIENT TEMPERATURE, THE LIVER AND RECTAL TEMPERATURES

27    OF THE DECEDENT AND TEMPERATURES TO FIND A

28    DETERMINATION OF THE POSTMORTEM INTERVAL.  WE USED ALL

G 12

1   THESE SOURCES, AND AFTER DISCUSSION, WE CAME TO A

2   CONCLUSION AND GAVE A RANGE OF HOURS REGARDING THE

3   POSTMORTEM INTERVAL.

4       Q     AND IS THAT STILL THE MOST COMMON PRACTICE

5   OF DETERMINING POSTMORTEM INTERVAL WITHIN THE COUNTY

6   OF LOS ANGELES -- WITHIN THE L.A. COUNTY CORONER'S

7   OFFICE?

8       A     THE -- IT DEPENDS ON THE CIRCUMSTANCES

9   INVOLVED IN EACH INDIVIDUAL CASE.  IN THIS CASE, THE

10  CHIEF MEDICAL EXAMINER CORONER AND I DETERMINED THAT

11  THIS WAS THE BEST -- THAT THESE WERE THE BEST FACTORS

12  TO USE IN THE DETERMINATION.

13      Q     OKAY.

14            NOW, THE MODEL OR METHOD OF USING OR

15  TESTING VITREOUS EYEBALL FLUID, IS THAT THE STANDARD

16  PRACTICE WITHIN THE LOS ANGELES COUNTY CORONER'S

17  OFFICE FOR DETERMINING POSTMORTEM INTERVAL?

18      A     WE DETERMINED THAT IN OUR CASE, IN THE CASE

19  OF VANGELA AND TEANNA HAYES, THAT THE VITREOUS

20  POTASSIUM LEVEL WOULD NOT BE USEFUL IN DETERMINING THE

21  CAUSE -- EXCUSE ME -- IN DETERMINING THE POSTMORTEM

22  INTERVAL.  I AM UNAWARE OF HOW -- EXACTLY HOW OFTEN IT

23  IS USED BY OTHER MEDICAL EXAMINERS AT THE LOS ANGELES

24  COUNTY CORONER'S OFFICE.

25      Q     OKAY.

26            LET ME ASK YOU THIS QUESTION.

27            YOU INDICATED THAT AS PART OF THE AUTOPSY

28  REPORT, THAT THE VITREOUS EYEBALL FLUID WAS TESTED AT

G 13

1  SOME POINT IN TIME IN THE CORONER PROTOCOL PROCESS; IS

2  THAT CORRECT?

3      A.    YES.

4      Q     AND WAS THE FACT THAT THE VITREOUS EYEBALL

5  FLUID WAS TESTED -- NOT TESTED, BUT ANALYZED, SO IN

6  OTHER WORDS, THAT THE VITREOUS HUMOR AND/OR EYEBALL

7  FLUID WAS TAKEN FROM THE BODIES, WAS THAT INCLUDED IN

8  THE AUTOPSY REPORT THAT WAS TURNED OVER TO THE L.A.

9  COUNTY DISTRICT ATTORNEY'S OFFICE FOR PURPOSES OF

10  MEMORIALIZING THE AUTOPSY REPORT?

11      A     THESE -- THE VALUES OF THE VITREOUS HUMOR

12  LEVELS WERE TURNED OVER TO THE DISTRICT ATTORNEY

13  WITHIN THE LAST FEW MONTHS.  THERE -- IN THE PRINTING

14  UP OF THE CORONER'S REPORT FOR DISTRIBUTION IN TERMS

15  OF DISCOVERY, THERE WAS AN OVERSIGHT IN THAT THE EXACT

16  VALUES OF VITREOUS HUMOR SAMPLE WERE NOT INCLUDED.

17  THIS WAS CORRECTED WITHIN THE LAST FEW MONTHS WHEN --

18  FOLLOWING VISITS OF MEMBERS OF THE DISTRICT ATTORNEY'S

19  OFFICE TO THE CORONER'S OFFICE.  WE TURNED OVER THE

20  ACTUAL COPIES SHOWING THE VALUES OF THE POTASSIUM AND

21  ELECTROLYTES.

22      Q     BUT MY QUESTION TO YOU, DOCTOR, IS, THE

23  FACT THAT THE VITREOUS HUMOR FLUID WAS COLLECTED, WAS

24  THAT CONTAINED IN THE ORIGINAL AUTOPSY MATERIAL THAT

25  WAS TURNED OVER TO THE LOS ANGELES COUNTY DISTRICT

26  ATTORNEY'S OFFICE?

27      A     YES, IT WAS.

28

G14

1          MR. GRACE:  AND, YOUR HONOR, I PREPARED A REPORT

2     THAT I WOULD LIKE TO BE MARKED AS PEOPLE'S 1 FOR THESE

3     PROCEEDINGS.

4          THE COURT:  ALL RIGHT.

5               PEOPLE'S 1.

6

7               (PEO'S 1 FOR ID  =

8                    LABORATORY RESULTS REPORT)

9

10         MR. GRACE:  MAY I APPROACH THE WITNESS, YOUR

11    HONOR?

12         THE COURT:  YOU MAY.

13         Q    BY MR. GRACE:  SHOWING YOU WHAT HAS BEEN

14    MARKED AS PEOPLE'S 1 FOR IDENTIFICATION, DOCTOR, DO

15    YOU RECOGNIZE THAT?

16         A    YES.

17         Q    AND WHAT IS THAT?

18         A    THIS IS A LABORATORY RESULT PAGE,

19    INDICATING THAT THE VITREOUS HUMOR WAS EXAMINED FOR

20    ELECTROLYTES WITH A SPECIAL TESTING.  THIS DOES NOT

21    GIVE THE RESULTS OF THE TEST, BUT GIVES INFORMATION

22    THAT THE TEST WAS PERFORMED ON TEANNA HAYES.

23         Q    AND SO TO YOUR KNOWLEDGE, THAT PARTICULAR

24    SHEET INDICATING THAT THE VITREOUS HUMOR WAS COLLECTED

25    BOTH FROM TEANNA HAYES AND VANGELA HAYES WAS TURNED

26    OVER TO THE PROSECUTORS IN THE ORIGINAL AUTOPSY

27    REPORT?

28

G15

1      THE COURT:  DOCTOR, MAY I SEE THAT?  MAY I SEE

2  THE DOCUMENT?

3      THE WITNESS:  EXCUSE ME.

4      THE COURT:  THANK YOU.

5          GO AHEAD.  FINISH.

6      THE WITNESS:  YES.

7      MR. GRACE:  THANK YOU, YOUR HONOR.

8          I DON'T HAVE ANY FURTHER QUESTIONS.

9      THE COURT:  REDIRECT.

10     MR. HAYES:  YES.

11

12              REDIRECT EXAMINATION

13

14  BY MR. HAYES:

15     Q     DR. GUTSTADT, YOU SAID THAT YOU PERFORMED

16  THE TIME OF DEATH INVESTIGATION INTO THIS CASE,

17  CORRECT?

18     A     YES.

19     Q     NOW, YOU ONLY USED A TEMPERATURE BASED

20  METHOD PRIMARILY; IS THAT CORRECT?

21     A     I USED THE TEMPERATURE BASED -- BASE METHOD

22  ALONG WITH THE NOMOGRAM PROVIDED BY THE -- BY THE

23  CORONER'S OFFICE, AND WE -- I USED THIS ALONG WITH

24  CONSULTATION WITH THE CHIEF MEDICAL EXAMINER CORONER,

25  ALONG WITH OTHER FACTORS TO DETERMINE THE POSTMORTEM

26  INTERVAL.

27     Q     AND YOU MADE REFERENCE TO THAT YOU UTILIZED

28  A RECTAL TEMPERATURE IN YOUR ESTIMATION; IS THAT

G16

1   CORRECT?

2        A     YES, I DID.

3        Q     AND IN FACT, DOCTOR, NO RECTAL TEMPERATURES

4   WERE DONE TO MAKE THAT DETERMINATION; IS THAT CORRECT?

5        A     IF I MAY CONSULT MY REPORT HERE.

6

7               (BRIEF PAUSE.)

8

9        THE WITNESS:  ACCORDING TO THIS, THERE WAS NO

10  RECTAL TEMPERATURE TAKEN BY THE INVESTIGATOR.

11       THE COURT:  MR. HAYES, ANY OTHER QUESTIONS?

12       MR. HAYES:  YES.  SORRY, YOUR HONOR.

13       Q     SO BEING THAT NO RECTAL TEMPERATURE WAS

14  TAKEN, THEN BASICALLY YOU MADE A GUESS?

15       THE COURT:  SUSTAINED.

16            ANYTHING ELSE FOR DR. GUTSTADT?

17            THE ISSUE IS THE DISCOVERY ISSUE THAT

18  YOU'VE RAISED, MR. HAYES.  SO HOW HE CALCULATED, HE'S

19  ALREADY TESTIFIED TO ON AT LEAST THREE OCCASIONS NOW.

20  SO THERE'S A FULL RECORD AS TO HOW HE DID WHAT HE DID.

21            THE ISSUE IS SIMPLY DISCOVERY.  DO YOU HAVE

22  ANY OTHER QUESTIONS FOR HIM ON THAT?

23       MR. HAYES:  NO, YOUR HONOR.

24       THE COURT:  ALL RIGHT.

25            ANY RECROSS?

26       MR. GRACE:  NO.  NOTHING FURTHER.

27       THE COURT:  DR. GUTSTADT, THANK YOU.

28            MR. MUTO, COME ON UP.

G17

```
 1            WOULD YOU RETRIEVE DEFENSE A FROM HIM?
 2            MR. MUTO, COME ON UP.

 3

 4            (BRIEF PAUSE.)

 5

 6       THE COURT:  MADAM CLERK.

 7

 8                    JOSEPH JOHN MUTO,

 9

10  CALLED AS A WITNESS BY THE DEFENDANT, WAS SWORN AND

11  TESTIFIED AS FOLLOWS:

12       THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

13  SWORN.

14            DO YOU SOLEMNLY STATE THAT THE TESTIMONY

15  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS

16  COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

17  BUT THE TRUTH, SO HELP YOU GOD?

18       THE WITNESS:  YES, I DO.

19       THE CLERK:  PLEASE BE SEATED IN THE WITNESS

20  STAND.

21            STATE AND SPELL YOUR FULL NAME FOR THE

22  COURT RECORD.

23       THE WITNESS:  JOSEPH JOHN MUTO, JOSEPH,

24  J-O-S-E-P-H, J-O-H-N, MUTO, M-U-T-O.

25       THE COURT:  ALL RIGHT.

26            GOOD MORNING, MR. MUTO.

27            MR. HAYES.

28       MR. HAYES:  YES.  THANK YOU.
```

G18

```
 1                    DIRECT EXAMINATION
 2
 3    BY MR. HAYES:
 4         Q     GOOD MORNING, MR. MUTO.
 5         A     GOOD MORNING.
 6         Q     YOU WERE CERTIFIED ADVISER OF THE
 7    TOXICOLOGY LAB AT THE L.A. COUNTY CORONER'S OFFICE
 8    AROUND 1999?
 9         A.    YES, I WAS.
10         Q     AND IT WAS YOUR OFFICE'S JOB TO ANALYZE
11    COLLECTED SAMPLES?
12         A     YES.
13         Q     NOW, THE ISSUE HERE TODAY, MR. MUTO, IS
14    THAT YOUR POLICY FOR DISCARDING SAMPLES IS JUST A
15    POLICY; IS THAT CORRECT?
16         A     YES.
17         Q     THE DESTRUCTION OF EVIDENCE OR THE
18    DESTROYING OF EVIDENCE, WAS THE LOS ANGELES COUNTY
19    DISTRICT ATTORNEY'S OFFICE NOTIFIED THAT ANY SAMPLES
20    IN THIS CASE WERE ACTUALLY DESTROYED?
21         A     NOT SPECIFICALLY, NO.
22         Q     COULD YOU CLARIFY "NOT SPECIFICALLY," SIR?
23         A     WELL, THROUGH -- THROUGH TRAINING, THE
24    DISTRICT ATTORNEY'S OFFICE, AS WELL AS THE PUBLIC
25    DEFENDER'S OFFICE HAS THE DEPARTMENT OF CORONER'S
26    PROTOCOLS, POLICIES AND PROCEDURES.  PART OF THAT IS
27    THE RETENTION SCHEDULE FOR VARIOUS SPECIMENS AND OTHER
28    EVIDENCE THAT'S COLLECTED ON CORONER CASES.
```

G19

1    Q    AND ARE YOU AWARE AS YOU WERE OBSERVING
2  THAT THERE IS A GOVERNMENT CODE REQUIREMENT THAT
3  CERTAIN TYPES OF TISSUES ARE TO BE RETAINED BY THE
4  CORONER'S OFFICE?
5    A    IT GIVES US THE AUTHORITY TO RETAIN, YES.
6    Q    AND SO WITH THAT AUTHORITY TO RETAIN THESE
7  SPECIMENS THAT ARE SUBJECT TO CRIMINAL PROSECUTION,
8  YOU STILL TAKE A POSITION THAT IT'S ALLOWABLE?
9    A    WHAT'S ALLOWABLE?
10    Q    TO DISCARD SAMPLES?
11    A    WELL, I THINK -- WELL, I THINK THE
12  GOVERNMENT CODE GIVES US THE AUTHORITY TO COLLECT AND
13  RETAIN SPECIMENS FOR OUR INVESTIGATION.  SO THAT'S
14  WHAT WE DO.  AND AS PART OF THAT, WE HAVE A RETENTION
15  AND DISPOSAL POLICY.
16    Q    OKAY.
17      YOU USE THE WORD "INVESTIGATION."
18    A    YES.
19    Q    SO YOU -- YOU'RE SAYING ITS POLICY DOES NOT
20  GO OR INCLUDE ISSUES OF DISCOVERY WITHIN A CRIMINAL
21  CASE.  YOU ARE SAYING THAT YOUR --
22    A    I'M NOT SURE I UNDERSTAND THE QUESTION.
23    Q    YOU SAID THAT YOU ARE ALLOWED TO RETAIN
24  SAMPLES FOR YOUR INVESTIGATION?
25    A    INTO THE CAUSE AND MANNER OF DEATH.  THAT
26  INVESTIGATION, YES, SIR.
27    Q    AND SO MY QUESTION IS, IN THAT PROCESS, YOU
28  HAVE NO OBLIGATION OF PROVIDING DISCOVERY OF THAT

G20

1  INFORMATION?

2      A    WE PROVIDE THAT DISCOVERY INFORMATION TO

3  WHOEVER REQUESTS IT.  I'M NOT SURE I FOLLOW YOU, SIR.

4      Q    FIRST QUESTION THAT I ASKED YOU WAS WHETHER

5  OR NOT YOU MADE NOTIFICATION TO THE DISTRICT

6  ATTORNEY'S OFFICE ABOUT THE DESTRUCTION AND THE

7  PROCESSING OF EVIDENCE.

8      A    OKAY.  AGAIN, WE DO NOT MAKE SPECIFIC

9  NOTIFICATION ON INDIVIDUAL CASES.

10      MR. HAYES:  THANK YOU.  THANK YOU, MR. MUTO.

11      THE COURT:  ARE YOU DONE?  WHEN YOU THANK A

12  WITNESS, NORMALLY THAT MEANS YOU ARE DONE.  ARE YOU

13  DONE?

14      MR. HAYES:  YES, YOUR HONOR.

15      THE COURT:  MR. GRACE.

16      MR. GRACE:  THANK YOU, YOUR HONOR.

17

18              CROSS-EXAMINATION

19

20  BY MR. GRACE:

21      Q    DR. MUTO, YOU INDICATED YOU ARE THE

22  DIRECTOR OF THE LAB FOR THE LOS ANGELES COUNTY

23  CORONER'S OFFICE?

24      A    THAT IS CORRECT.

25      Q    AND IN THAT CAPACITY, WERE YOU FAMILIAR

26  WITH THE POLICY WITH RESPECT TO THE COLLECTION OF

27  CERTAIN FLUIDS RECOVERED FROM DECEASED PERSONS WHO

28  COME UNDER THE SPHERE OR THE INVESTIGATION AS TO TIME

G21

1 | AND MANNER OF DEATH WITHIN L.A. COUNTY?

2 |     A    YES.

3 |     Q    AND I'LL JUST ASK YOU DIRECTLY, WHAT IS

4 | YOUR POLICY WITH RESPECT TO THE RETENTION OF ANY

5 | FLUIDS RECOVERED IN AUTOPSY?

6 |     A    WELL, IT DEPENDS ON WHAT THOSE SPECIMENS

7 | ARE.  IN THIS PARTICULAR CASE, WE'RE TALKING ABOUT

8 | TOXICOLOGY SPECIMENS, SPECIMENS THAT ARE COLLECTED FOR

9 | DRUG TESTING.

10 |     THE RETENTION POLICY FOR TOXICOLOGY

11 | SPECIMENS STATES THAT BLOOD SAMPLES WILL BE RETAINED

12 | FOR A MINIMUM OF ONE YEAR.  ALL OTHER SPECIMENS WILL

13 | BE RETAINED FOR A MINIMUM OF SIX MONTHS.

14 |     OUR PRACTICE IS TO RETAIN THEM FOR AS LONG

15 | AS WE HAVE STORAGE CAPABILITY.  WE STORED THE --

16 | SPECIFICALLY, IN THIS CASE, WE STORED THE VITREOUS

17 | SAMPLES FOR 11 MONTHS.

18 |     Q    AND THEN TO YOUR KNOWLEDGE, WERE THE

19 | VITREOUS SAMPLES SENT OUT BY YOUR CORONER'S OFFICE TO

20 | BE ANALYZED AND THEN RETURNED TO DR. GUTSTADT FOR HIS

21 | OWN ANALYSIS?

22 |     A    THE VITREOUS SAMPLE WAS SENT OUT TO PERFORM

23 | BLOOD CHEMISTRY TESTS THAT THE CORONER'S OFFICE DOES

24 | NOT PERFORM IN-HOUSE.  THE RESULTS WERE -- OF THOSE

25 | TESTS WERE SUBMITTED, ALONG WITH OUR IN-HOUSE

26 | TOXICOLOGY RESULTS, TO DR. GUTSTADT.

27 |     Q    AND IS IT YOUR UNDERSTANDING THAT AS PART

28 | OF THE ORIGINAL AUTOPSY PROTOCOL, THAT WAS TURNED OVER

G22

1  TO THE LOS ANGELES COUNTY CORONER'S OFFICE, THE FACT
2  THAT THE VITREOUS HUMOR FLUID WAS COLLECTED FROM
3  TEANNA HAYES AND VANGELA HAYES, PART OF THE ORIGINAL
4  AUTOPSY THAT WAS TURNED OVER TO OUR OFFICE, THE
5  DISTRICT ATTORNEY'S OFFICE?

6       A    ONE MORE TIME.  I'M SORRY.

7       Q    AS PART OF THE AUTOPSY PROTOCOL, IS THERE A
8  NOTATION OR NOTES AS TO TOXICOLOGY SAMPLES THAT ARE
9  RECOVERED FROM DECEDENTS?

10      A    YES.  THEY ARE ON VARIOUS FORMS THAT ARE
11 PART OF THE AUTOPSY PACKAGE.

12      Q    AND TO YOUR KNOWLEDGE, WITH RESPECT TO THIS
13 PARTICULAR CASE AND THE AUTOPSIES THAT WERE CONDUCTED
14 ON VANGELA HAYES AND TEANNA HAYES, WAS THE FACT THAT
15 THE VITREOUS HUMOR WAS COLLECTED FROM THOSE TWO
16 DECEDENTS IN THE ORIGINAL AUTOPSY REPORT THAT WAS
17 TURNED OVER TO THE LOS ANGELES COUNTY DISTRICT
18 ATTORNEY'S OFFICE?

19      A    IF THE DISTRICT ATTORNEY'S OFFICE ON THESE
20 TWO CASES GOT WHAT IS THE NORMAL PRACTICE OF OUR
21 AUTOPSY REPORT?  YES, THEY DID.

22      Q    ALL RIGHT.

23           AND THEN HAVE YOU LEARNED THROUGH THE
24 COURSE OF FURTHER INVESTIGATION THAT WAS DONE IN THIS
25 CASE THAT THE ANALYZATION OF THE VITREOUS HUMOR WAS
26 NOT CONTAINED IN THE ORIGINAL AUTOPSY PROTOCOL THAT
27 WAS TURNED OVER TO THE L.A. COUNTY DISTRICT ATTORNEY'S
28 OFFICE?

G 23

```
 1          A      NOT UNTIL THIS MORNING.

 2          MR. GRACE:   OKAY.

 3               THANK YOU, YOUR HONOR.

 4               I DON'T HAVE ANY FURTHER QUESTIONS.

 5          THE COURT:   ANY REDIRECT?

 6          MR. HAYES:   YES.

 7

 8                    REDIRECT EXAMINATION

 9

10   BY MR. HAYES:

11          Q      YOU SAID YOU OUTSOURCED THE VITREOUS

12   TESTING TO AN OUTSIDE VENDOR?

13          A      FOR THE BLOOD CHEMISTRY, YES.

14          Q      AND IN WHAT IS CALLED A HOMICIDE SCREENING,

15   WHAT DOES THAT ENTAIL AS IT RELATES TO THE VITREOUS?

16          A      IT MAY NOT ENTAIL ANYTHING.  NORMALLY, AS

17   LONG AS THERE'S A BLOOD SAMPLE COLLECTED ON A CASE, A

18   HOMICIDE SCREENING WILL INCLUDE ALCOHOL AND OTHER

19   DRUGS OF ABUSE.

20               THE LABORATORY NORMALLY WILL TEST BLOOD, IF

21   AVAILABLE, VITREOUS AND OTHER SPECIMENS THAT MAY BE

22   COLLECTED OR AVAILABLE FOR EVALUATION, IF NEEDED.

23          Q      OKAY.

24               SO WHEN YOU SEND OUT THE SAMPLE FOR

25   ANALYSIS, DO YOU SAY, "I ONLY WANT POTASSIUM SODIUM,"

26   OR DO YOU SAY, "I WANT A FULL PANEL OF EVERYTHING,"

27   THAT'S INCLUSIVE IN THAT TESTING?

28
```

G24

1      A     WELL, IN THIS PARTICULAR CASE, WE SENT

2   OUT -- WE REQUESTED AN ELECTROLYTE PANEL, AND THE

3   PANEL DOES INCLUDE MULTIPLE ELECTROLYTES.

4      Q     AND BEING THAT IT CONTAINS MULTIPLE

5   ELECTROLYTES, IS IT MORE THAN THREE AVAILABLE?

6      A     MORE THAN THREE ELECTROLYTES?

7      Q     YES.

8      A     IN THE PANEL THAT WE REQUESTED?

9      Q     IN THE VITREOUS ITSELF.

10     THE COURT:   THAT'S IRRELEVANT.

11          MR. MUTO, WHEN YOU REQUESTED AN ELECTROLYTE

12   PANEL ON THIS VITREOUS SAMPLE, TO YOUR KNOWLEDGE, WHAT

13   DOES THAT INCLUDE?  WHAT ELEMENTS ARE YOU LOOKING FOR?

14     THE WITNESS:   YEAH.   NORMALLY, WE'RE LOOKING FOR

15   SODIUM CHLORIDE AND POTASSIUM.

16     THE COURT:   THANK YOU.

17     Q     BY MR. HAYES:   AND WITHIN THAT -- STRIKE

18   THAT.

19          CAN UREA BE EXTRACTED IN THAT PRACTICE?

20     A     IT CAN BE DETECTED IN THE ELECTROLYTE

21   PROCESSING VITREOUS, YES.

22     Q     WHAT ABOUT GLUCOSE?

23     A     YES.

24     Q     LACTATE?

25     A     I'M NOT SURE.

26     Q     SO OTHER THAN THE SODIUM POTASSIUM, THERE

27   ARE OTHER ELEMENTS THAT ARE AVAILABLE FOR ANALYSIS

28   WITHIN THAT VITREOUS?

G 25

1       A       YES, THERE ARE.

2       Q       AND IT'S NOT YOUR RESPONSIBILITY TO MAKE A

3   DETERMINATION AS TO THEIR USE.  IT'S ONLY YOUR JOB TO

4   DETERMINE THAT THAT TEST WAS DONE?

5       A       YES.

6       Q       NOW, WE SUBMITTED TO -- EARLIER TO

7   DR. GUTSTADT WHAT WAS REFERENCED AS PEOPLE'S 1.  CAN

8   YOU GET --

9       MR. GRACE:  IS THAT IT?

10      THE COURT:  I'VE GOT IT.

11      THE WITNESS:  THANK YOU, YOUR HONOR.

12              YES, SIR.

13      Q       BY MR. HAYES:  OKAY.

14              IT SHOWS THAT THE VITREOUS TEST WAS

15  REQUESTED; IS THAT CORRECT?

16      A       YES.

17      Q       AND ALL IT SHOWS ON THE LEVEL FOUND IS

18  WHAT?

19      A       THE RESULT ON THIS PARTICULAR TOX REPORT

20  SAYS DONE, D-O-N-E.

21      Q       AND WOULD THAT MEAN THEN THAT THE

22  TOXICOLOGIST MAHANA -- AM I PRONOUNCING THAT --

23  MAHANA, M-A-H-A-N-A?

24      A       MR. MAHANEY.

25      Q       MAHANEY?

26      A       YES.

27      Q       DOES THAT MEAN HE ANALYZED THAT?

28

G26

1      A      NO.    IT MEANS THAT HE WAS THE -- HE WAS THE

2    PERSON RESPONSIBLE FOR SENDING THE VITREOUS TO THE

3    OUTSIDE LABORATORY AND FOR RECEIVING THE RESULTS WHEN

4    THEY CAME BACK.

5      Q      HIS DATE SAYS IT WAS ANALYZED ON 9-27-99;

6    IS THAT CORRECT?

7      A      WELL, THAT'S WHAT THE REPORT SAYS.  BUT

8    WHAT THAT REPORT INDICATES -- OR I'M SORRY.  WHAT THAT

9    DATE INDICATES IS THE DATE THAT THIS ENTRY WAS ENTERED

10   INTO THE COMPUTER.

11     Q      THAT WAS NOT MY QUESTION.  MY QUESTION,

12   SIR, WAS, DOES IT NOT SAY THAT THE DATE ANALYZED IS

13   9-27-99?

14     A      YES.

15     THE COURT:  THIS IS NOT RELEVANT.  IT'S NOT

16   RELEVANT TO THE DISCOVERY ISSUE, MR. HAYES.

17     MR. HAYES:  WELL, YOUR HONOR --

18     THE COURT:  I JUST SAID IT'S NOT RELEVANT.  YOU

19   WANT TO ARGUE WITH SOMEBODY, ARGUE WITH SOMEBODY ELSE,

20   NOT ME.

21        NEXT QUESTION.

22     Q      BY MR. HAYES:  SO YOUR POSITION IS THAT IT

23   WAS THE DATE THAT WAS ENTERED INTO THE COMPUTER?

24     THE COURT:  NOT RELEVANT.  THE DATE IS NOT

25   RELEVANT ON THE REPORT HERE.

26     MR. HAYES:  THIS FORM SAYS WAS ANALYZED -- I'M

27   NOT TRYING TO BE ARGUMENTATIVE WITH THE COURT.

28

G27

1     THE COURT: SO WHAT? SO WHAT? IT'S A WEEK LATE.

2  SO WHAT? PLEASE DON'T WASTE MY TIME WITH THIS.

3        NEXT QUESTION.

4    Q   BY MR. HAYES: SO IN YOUR DESTRUCTION, ONCE

5  INFORMATION COMES TO YOUR KNOWLEDGE THAT YOU HAVE

6  DISPOSED OF THIS, DO YOU SEND A NOTIFICATION TO THE

7  DISTRICT ATTORNEY'S OFFICE?

8    A   NO, SIR.

9    Q   SO THEY ARE NOT AWARE THAT ACCORDING TO A

10  PARTICULAR CASE, THAT YOU HAVE --

11     THE COURT: SUSTAINED. YOU'RE ASKING IF HE'S

12  AWARE IF THEY'RE AWARE. YOU'RE ASKING HIM TO

13  SPECULATE AS TO THEIR STATE OF MIND. SUSTAINED.

14        NEXT QUESTION.

15    MR. HAYES: NO FURTHER QUESTIONS.

16    THE COURT: MR. GRACE.

17    MR. GRACE: NO FURTHER QUESTIONS.

18    THE COURT: MR. MUTO, THANK YOU.

19    THE WITNESS: THANK YOU, YOUR HONOR.

20    THE COURT: ALL RIGHT.

21    THE WITNESS: I'M FREE TO LEAVE?

22    THE COURT: YEAH.

23    MR. GRACE: YOUR HONOR, I DON'T BELIEVE THERE ARE

24  ANY OTHER WITNESSES IN THE COURT WITH RESPECT TO THE

25  DESTRUCTION OF EVIDENCE OR THE DISCOVERY ISSUE. THERE

26  ARE SOME OTHER WITNESSES THAT MR. HAYES --

27     THE COURT: WHO DO WE HAVE HERE?

28

G28

1      MR. GRACE:  PATRICIA WILKINSON, WHO IS NOW HEAD

2    DEPUTY WITH OUR OFFICE, SHE WAS HERE.  SHE WAS

3    SUBPOENAED WITH RESPECT TO THE ISSUE REGARDING

4    BENEFITS TO WITNESSES.  IT'S OUR POSITION THAT SHE

5    DOESN'T KNOW ANYTHING ABOUT THAT ISSUE.

6         THE COURT:  ALL RIGHT.

7           WELL, AT THIS POINT, I AM GOING TO EXCUSE

8    MISS WILKINSON, AND SHE'S SUBJECT TO RECALL.  I

9    HAVE -- I'M IN A TRIAL AT THIS MOMENT, MR. GRACE,

10   MR. HAYES, IN THE PENALTY PHASE, AND WE NEED TO FINISH

11   THIS TRIAL BECAUSE WE ARE EXCEEDING OUR TIME ESTIMATE

12   WITH THE JURY.

13          MR. HAYES, ARE YOU -- EXCUSE ME.

14          MR. GRACE, ARE YOU IN TRIAL?

15      MR. GRACE:  NO.  I AM -- I HAVE AN APPEARANCE

16   ACROSS THE HALL, BUT I'M NOT IN TRIAL.

17       THE COURT:  OKAY.

18

19           (BRIEF PAUSE.)

20

21      THE COURT:  WHY DON'T WE TRAIL THIS MATTER OVER

22   TILL TUESDAY THEN.

23           MISS WILKINSON, WHAT ARE YOUR CONCERNS?

24      MS. WILKINSON:  YOUR HONOR, I HAVE A DELEGATION

25   OF SIX CHINESE OFFICIALS COMING TO MY COURTHOUSE FOR A

26   LECTURE ON THE U.S. CRIMINAL --

27       THE COURT:  YOUR COURTHOUSE?

28

G 29

1      MS. WILKINSON:  ALHAMBRA.  AND I THINK THEY

2   INTEND TO BE THERE AT 10:00.  I ANTICIPATE AT LEAST

3   TWO HOURS SHOWING THEM THE COURTHOUSE, TALKING TO THE

4   PRESIDING JUDGE.

5      THE COURT:  WE'LL MAKE SURE YOU'RE NOT CALLED

6   UNTIL THE AFTERNOON ON TUESDAY.  HOW'S THAT?

7      MS. WILKINSON:  THAT'S FINE.

8      THE COURT:  WE'LL COORDINATE THAT THROUGH

9   MR. GRACE.

10     MR. GRACE:  MAYBE I CAN WORK IT OUT SO THAT

11  MR. HAYES CAN JUST HAVE HER ON CALL.  AGAIN, I DON'T

12  BELIEVE SHE'S RELEVANT TO THE PROCEEDING.

13     THE COURT:  WELL, WE'LL SEE.

14     MS. WILKINSON:  THANK YOU, YOUR HONOR.

15     THE COURT:  WHO ELSE DO WE HAVE?  DO WE HAVE OUR

16  D.A. INVESTIGATOR?

17     MR. GRACE:  YES.  I'LL HAVE THEM STAND UP.

18        ROBERT TUKUA.

19     THE COURT:  OKAY.

20        MR. TAKUA, ARE YOU AVAILABLE TUESDAY

21  MORNING?

22     MR. TAKUA:  I WILL BE.

23     THE COURT:  OKAY.  GOOD.

24        MR. HAYES, I'M GOING TO TRAIL THIS OVER TO

25  TUESDAY MORNING TO CONTINUE THE HEARING.

26        WE'LL SEE YOU BACK THEN.

27     MR. HAYES:  THANK YOU, YOUR HONOR.

28

G 30

```
 1                    (AN ADJOURNMENT WAS TAKEN
 2                    UNTIL, JULY 27, 2010, 8:30
 3                    A.M.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

G31

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2      FOR THE COUNTY OF LOS ANGELES

3 DEPARTMENT NO. 110   HON. LANCE A. ITO, JUDGE

4

 PEOPLE OF THE STATE OF CALIFORNIA,  )

5              )

          PLAINTIFF, )

6              ) NO. BA197149

 VS.             )

7              )

 HENRY CEPHUS HAYES,       )

8              ) REPORTER'S

              ) CERTIFICATE

9              )

         DEFENDANT. )

10 _____)

11

12

13    I, JANET M. MOXHAM, C.S.R. NO. 4855,

14 OFFICIAL REPORTER OF THE SUPERIOR COURT OF THE STATE

15 OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO

16 HEREBY CERTIFY THAT I DID CORRECTLY REPORT THE

17 PROCEEDINGS CONTAINED HEREIN AND THAT THE FOREGOING

18 PAGES, 1 THROUGH 30, INCLUSIVE, COMPRISE A FULL, TRUE

19 AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN THE

20 ABOVE-ENTITLED MATTER ON JULY 23, 2010.

21    DATED THIS 16TH DAY OF AUGUST, 2010.

22

23

24

25

26            , C.S.R. #4855

27       OFFICIAL REPORTER

28

G32



EXHIBIT

Declaration

I, Rick Sternfeld, am an attorney licensed to practice law in the state of California, and I am employed as deputy alternate public defender for the county of Los Angeles. I have been licensed to practice law in the state of California for 24 years, and have been with the alternate public defender for 10 years.

In August, 2002, my office was appointed to represent Mr. Henry Hayes in a special circumstance case where the District Attorney's office was seeking the death penalty. Mr. Hayes was alleged to have killed his wife and seven year old daughter. Our office was appointed because the Public Defender's office had declared a conflict. My office then assigned the case to Jeri Polen and myself. The assigned deputy district attorney was Robert Grace.

During the first few weeks of my representation of Mr. Hayes I took on the primary responsibility of becoming familiar with the issue the time of death of both victims. This issue was heavily litigated at the preliminary hearing by deputy public defender, Doug Goldstein, and was clearly an issue that would be litigated at trial. To that end, I met with the coroner's investigator Dana Bee, and deputy medical examiner, Jeffrey Gutstadt. I also attempted to become familiar with the "science" involved in time of death issues. This issue was thoroughly litigated in the guilt phase of the trial.

As the court knows, Mr. Hayes was found guilty of killing both his wife and daughter, and the jury found the special circumstance of multiple murder to be true. At the penalty phase, the jury was unable to reach a verdict, and the court declared a mistrial. The District Attorney's office decided not to retry Mr. Hayes, and he was sentenced in 2003 to LWOP.

Recently I learned that Mr. Hayes had filed a motion to vacate his conviction and sentence due to the destruction of certain evidence by the Los Angeles Coroner's office. Apparently the Coroner's office through Dr. Gutstadt, sometime in September, 1999, sent to Smith Kline Beecham labs a sample of Vangela and Tiana's vitreous eye fluid to be analyzed in order to determine the time of death of both victims. Shortly thereafter, this lab sent a report back to Dr. Gutstadt. This report was never turned over to Ms. Polen nor myself, or to anyone in our office. Apparently, it was never turned over to the District Attorney's office until recently.

In addition, I was asked by this court in April or May, of 2010 to contact the Coroner's office to see if any vitreous fluid was still available for testing. I contacted Mr. Muto, the person in charge of the lab for the Coroner's office, and was told that both vitreous samples were destroyed on August 4, 2000, some two years prior to my office's appointment in this case.

Dated this 9 July, 2010

Rick Sternfeld



EXHIBIT

.1

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            FOR THE COUNTY OF LOS ANGELES

3    DEPARTMENT NO. 110          HON. LANCE A. ITO, JUDGE

4

5

6

THE PEOPLE OF THE STATE OF CALIFORNIA,)

7                                      )

                        PLAINTIFF,    )

8                                      )

                  VS.                 )  NO. BA197149

9                                      )

HENRY CEPHUS HAYES.                    )

10                                      )

                  DEFENDANT.          )

11 _____)

12

              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                   JULY 27, 2010

                PAGES 1 - 11, INCLUSIVE

14

15

    APPEARANCES:

16

17   FOR THE PEOPLE:     STEVE COOLEY, DISTRICT ATTORNEY

                         BY:  ROBERT GRACE, DEPUTY

18                       210 WEST TEMPLE STREET

                         18-000 FOLTZ CRIMINAL JUSTICE

19                       CENTER

                         LOS ANGELES, CALIFORNIA  90012

20

    FOR THE DEFENDANT:   IN PROPRIA PERSONA

21

22

23

24

25

26

27

                         JANET M. MOXHAM, CSR #4855

28   COPY                OFFICIAL REPORTER

1

1          M A S T E R   I N D E X
                  JULY 27, 2010
2

3

4     CHRONOLOGICAL AND ALPHABETICAL INDEX OF WITNESSES

5  PEOPLE'S
   WITNESSES        DIRECT    CROSS    REDIRECT    RECROSS
6

7  HARVETH, JACK        4          7

8

9  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

               EXHIBITS
10

11                NONE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1   CASE NAME:            PEOPLE VS. HENRY CEPHUS HAYES
 2   CASE NUMBER:          NO. BA197149
 3   LOS ANGELES, CA.      JULY 27, 2010
 4   TIME:                 8:40 A.M.
 5   DEPARTMENT 110        HON. LANCE A. ITO, JUDGE
 6   REPORTER:             JANET M. MOXHAM, CSR #4855
 7   APPEARANCES:
 8                    THE DEFENDANT BEING
 9                    PRESENT, APPEARING IN
10                    PROPRIA PERSONA; ROBERT
11                    GRACE, DEPUTY DISTRICT
12                    ATTORNEY FOR LOS ANGELES
13                    COUNTY, REPRESENTING THE
14                    PEOPLE OF THE STATE OF
15                    CALIFORNIA.
16
17                         --000--
18
19       THE COURT:  GOOD MORNING, COUNSEL.
20             ON THE HENRY HAYES MATTER.
21             MR. HAYES IS PRESENT BEFORE THE COURT
22   REPRESENTING HIMSELF, PEOPLE REPRESENTED BY MR. GRACE.
23             WE HAD A REMAINING ISSUE CONCERNING
24   DISCOVERY, POST-TRIAL DISCOVERY.
25             MR. GRACE, WHAT DO YOU HAVE ON THE RECORD?
26       MR. GRACE:  YES, YOUR HONOR.
27             I WANT TO PUT ON THE RECORD THAT I'M
28   HANDING YOUR CLERK AN ORIGINAL COPY AND WITE-OUT COPY
```

1 | OF WITNESS RELOCATION INFORMATION THAT WAS REQUESTED

2 | BY THE DEFENDANT, AND I'M HANDING IT TO THE COURT SO

3 | THE COURT CAN MAKE A DETERMINATION AS TO WHETHER THE

4 | PROPOSED WITE-OUT COPY BE THE COPY THAT WAS GIVEN TO

5 | DEFENDANT HAYES AS -- IN COMPLIANCE WITH HIS

6 | DISCOVERY. AND ALL WE DID WAS REDACT IDENTIFYING

7 | INFORMATION, INCLUDING CII AND CALIFORNIA DRIVER'S

8 | LICENSE NUMBERS.

9 | THE COURT: ALL RIGHT.

10 | I'VE REVIEWED THE ORIGINAL AND REDACTED

11 | FORMS, AND I WILL APPROVE THE WITED-OUT COPY TO BE

12 | TURNED OVER TO DEFENDANT.

13 | MADAM CLERK.

14 | THE CLERK: YES, YOUR HONOR.

15 | THE COURT: I'M GOING TO MAKE ONE COPY. I'LL

16 | MAKE THE ORIGINAL A COURT'S EXHIBIT TO BE SEALED IN

17 | THE COURT FILE.

18 | THE CLERK: YES, YOUR HONOR.

19 | THE COURT: AND SECOND COPY TO BE PROVIDED TO

20 | MR. HAYES TODAY.

21 | MR. GRACE: THANK YOU.

22 | THEN TODAY, WE HAVE HERE CAPTAIN JACK

23 | HARVETH WITH THE L.A. COUNTY DISTRICT ATTORNEY'S

24 | INVESTIGATORS UNIT, AND HE CAN ACT AS THE CUSTODIAN OF

25 | RECORDS TO TESTIFY TO THESE RECORDS AND THE PROCEDURES

26 | THAT ARE DONE WITH RESPECT TO WITNESS RELOCATION IN

27 | OUR OFFICE.

28

1          THE COURT:  ALL RIGHT.

2                MADAM CLERK.

3          THE CLERK:  YES, YOUR HONOR.

4          THE COURT:  THIS IS TO BE TURNED OVER TO

5    MR. HAYES TODAY, OF COURSE, MINUS THE PAPER CLIP.

6                ARE YOU CALLING MR. HARVETH, OR IS HE HERE

7    AT THE REQUEST OF THE DEFENSE?

8          MR. GRACE:  HE'S HERE AT THE REQUEST OF THE

9    DEFENSE TO ANSWER ANY QUESTIONS THAT THE DEFENDANT MAY

10   HAVE WITH RESPECT TO OUR PROCEDURE REGARDING

11   RELOCATION.  I WOULD LIKE TO CALL HIM JUST TO BRIEFLY

12   EXPLAIN TO THE COURT THAT PROCEDURE, HOW IT WORKS, TO

13   CLEAR UP ANY MISCONCEPTIONS.

14         THE COURT:  MR. HARVETH.

15

16               (BRIEF PAUSE.)

17

18                    JACK HARVETH,

19

20   CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

21   TESTIFIED AS FOLLOWS:

22         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO BE

23   SWORN.

24               DO YOU SOLEMNLY STATE THAT THE TESTIMONY

25   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS

26   COURT, SHALL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING

27   BUT THE TRUTH, SO HELP YOU GOD?

28         THE WITNESS:  I DO.

1        THE CLERK:  PLEASE BE SEATED IN THE WITNESS

2   STAND.

3            STATE AND SPELL YOUR FULL NAME FOR THE

4   COURT RECORD.

5        THE WITNESS:  MY NAME IS JACK, J-A-C-K, HARVETH,

6   H-A-R-V AS IN VICTOR, E-T-H.

7        THE COURT:  MR. HARVETH, GOOD MORNING.

8        THE WITNESS:  GOOD MORNING, SIR.

9        THE COURT:  MR. GRACE.

10       MR. GRACE:  THANK YOU, YOUR HONOR.

11

12                     DIRECT EXAMINATION

13

14   BY MR. GRACE:

15       Q    CAPTAIN HARVETH, CAN YOU PLEASE STATE YOUR

16   OCCUPATION AND ASSIGNMENT?

17       A    YES.

18            I'M A CAPTAIN WITH LOS ANGELES COUNTY

19   DISTRICT ATTORNEY'S BUREAU OF INVESTIGATION.  I'M

20   PRESENTLY ASSIGNED TO THE ADMINISTRATIVE DIVISION.

21       Q    AND DO YOUR DUTIES WITHIN THE

22   ADMINISTRATIVE DIVISION INCLUDE OVERSEEING THE WITNESS

23   RELOCATION PROGRAM WITHIN THE DISTRICT ATTORNEY'S

24   OFFICE?

25       A    YES, I DO.

26       Q    CAN YOU PLEASE EXPLAIN WHAT IS THE WITNESS

27   RELOCATION PROGRAM AND HOW THAT PROGRAM WORKS?

28

1          A      IN A GENERAL OVERVIEW, THE PROGRAM IS
2     TWO-PRONGED.   THE BASIC EMPHASIS OF THE PROGRAM IS TO
3     RELOCATE ENDANGERED WITNESSES.   THE PROGRAM IS FUNDED
4     EITHER THROUGH STATE FUNDS OR THROUGH FUNDS DESIGNATED
5     BY THE COURT.

6          Q      AND WHEN SOMEONE WHO HAS AN ENDANGERED
7     WITNESS APPLIES FOR WITNESS RELOCATION FUNDING, HOW
8     DOES THAT PROCESS WORK ON A CASE-BY-CASE BASIS?

9          A      GENERALLY, OR IN ALL CASES, THE
10    INVESTIGATING OFFICER OR HIS OR HER DESIGNEE WILL
11    APPLY TO OUR OFFICE.   A SERIES OF PAPERWORK WILL BE
12    FILED THROUGH OUR OFFICE, AND THE INVESTIGATING
13    OFFICER OR THEIR DESIGNEE WILL MEET WITH
14    ADMINISTRATIVE PERSONNEL FROM THE BUREAU OF
15    INVESTIGATION, WHO APPROVES THE SPECIFICS OF THE
16    RELOCATION.

17         Q      AND GENERALLY, DOES RELOCATION ENTAIL
18    PROVIDING FUNDS FOR THE ENDANGERED WITNESS TO MOVE TO
19    A NEW LOCATION?

20         A      YES.

21         Q      AND DO THEY HAVE TO PROVIDE ANY
22    DOCUMENTATION TO YOU WITH RESPECT TO THAT ACTUAL MOVE?

23         A      AFTER THE APPROVAL PROCESS, THE
24    INVESTIGATING OFFICER ULTIMATELY WILL HAVE TO PROVIDE
25    A SERIES OF RECEIPTS FOR THE HOUSING, FOR FOOD, OR
26    WHATEVER THEY'VE BEEN APPROVED FOR, AND THAT IS
27    PROCESSED THROUGH THE DISTRICT ATTORNEY'S BUSINESS OR
28    OUR OFFICE.

1     Q    AND THEN GENERALLY, DOES A WITNESS GET A

2  CHECK IN THEIR HAND, OR DO THEY -- IS THE MONEY PAID

3  DIRECTLY TO A LANDLORD?  HOW DOES THAT WORK?

4     A    WELL, IT CAN VARY, DEPENDING UPON THE

5  INVESTIGATING OFFICER.  ULTIMATELY, RECEIPT HAS TO BE

6  GATHERED FROM THE LANDLORD AND RETURNED TO OUR OFFICE

7  TO RECEIVE PAYMENT FOR THE HOUSING.

8     Q    AND IN THIS PARTICULAR CASE, WERE YOU ASKED

9  TO RETRIEVE SOME RECORDS REGARDING A WITNESS

10  RELOCATION THAT WAS DONE IN THE CASE OF PEOPLE VERSUS

11  HENRY HAYES?

12     A    YES, I WAS.

13    MR. GRACE:  MAY I APPROACH THE WITNESS, YOUR

14  HONOR?

15    THE COURT:  YES.

16     Q    BY MR. GRACE:  SHOWING YOU SOME

17  DOCUMENTATION, DO YOU RECOGNIZE THAT?

18     A    YES, I DO.

19     Q    AND HOW DO YOU RECOGNIZE THAT?

20     A    I RECOGNIZE IT BY ITS WITNESS IDENTIFYING

21  NUMBER.  THE NUMBER IS 19-334, AND IT CORRESPONDS TO

22  THE CASE AGAINST DEFENDANT HAYES.

23     Q    AND DOES THAT INVOLVE A CASE NUMBER

24  BA197149?

25     A    YES, IT DOES.

26     Q    AND DOES THAT DOCUMENTATION INCLUDE ANY

27  NOTES OR RECEIPTS, ANY INFORMATION FOR RELOCATION THAT

28  WAS DONE FOR AN ANGELA HAYES?

1     A    IT'S ALL THE RECORDS THAT WE HAVE IN THE

2  DISTRICT ATTORNEY'S OFFICE'S POSSESSION, YES.

3     Q    AND DOES IT INDICATE WHETHER A RELOCATION

4  WAS DONE AND HOW MUCH MONEY WAS EXPENDED FOR THAT

5  RELOCATION?

6     A    WELL, I DON'T ACTUALLY HAVE THE RECEIPTS

7  BECAUSE THEY NO LONGER EXIST, BUT WHAT IT DOES, IT

8  SIGNIFIES THE AMOUNT OF MONEY THAT WAS INITIALLY

9  APPROVED FOR THIS RELOCATION.

10     Q    AND HOW MUCH WAS THAT?

11     A    $1800.

12     Q    DOES IT INDICATE IT WAS FOR RELOCATION?

13     A    YES, IT WAS.

14     MR. GRACE:  THANK YOU.

15      NO FURTHER QUESTIONS FOR THE WITNESS.

16     THE COURT:  MR. HAYES.

17     MR. HAYES:  YES.

18

19                CROSS-EXAMINATION

20

21  BY MR. HAYES:

22     Q    GOOD MORNING.

23      IN THE -- WAS THE WITNESS RELOCATION

24  AGREEMENT MEMORIALIZED THE SAME TIME THAT THE FUNDS

25  WERE PAID TO ANGELA HAYES?

26     A    I'M SORRY.  COULD YOU REPEAT THE QUESTION,

27  PLEASE?

28

1    Q    WAS THE WITNESS RELOCATION CONTRACT

2   MEMORIALIZED AT THE SAME TIME ANGELA HAYES WAS

3   PROVIDED FUNDS?

4    A    ACTUALLY, THIS PREDATES THE RELOCATION.

5   THIS PAPERWORK HAS TO BE FILLED OUT BEFORE THE

6   RELOCATION GETS APPROVED FOR PAYMENT.

7    Q    AND HOW MANY TIMES WAS ANGELA HAYES

8   ADMITTED INTO THE WITNESS RELOCATION PROGRAM?

9    A    BASED UPON THE RECORDS I WAS ABLE TO

10  LOCATE, I ONLY SHOW RECORDS OF ONE RELOCATION.

11   Q    AND THAT WAS ON OR ABOUT MARCH 15, 2000?

12   A    YES.   THAT'S WHAT THE PAPERWORK SHOWS.

13   Q    OKAY.

14        SO SHE WAS ONLY RELOCATED ONE TIME?

15   A    BASED UPON THE PAPERWORK THAT I'M

16  REVIEWING, YES.

17   Q    AND COULD YOU TELL US, SIR, THE TIME FRAME

18  BETWEEN MARCH -- COULD YOU TELL US, SIR, THE DATE THAT

19  THE WITNESS RELOCATION CONTRACT WAS MEMORIALIZED?

20   A    ACCORDING TO THE PAPERWORK, THIS WAS FILLED

21  OUT ON MARCH 15TH, 2000.

22   Q    I'M SPEAKING SPECIFICALLY OF THE WITNESS

23  ADVISEMENT.

24   A    YES.

25   Q    DO YOU HAVE THAT?

26   A    YES, I DO.

27   Q    OKAY.

28        WHAT DATE WAS THAT SIGNED OFF?

1          A        OCTOBER 21ST, 2001.

2          Q        AND SO HOW FAR FROM THE ORIGINAL

3     APPLICATION TO THAT SIGNATURE DATE IS THAT?

4          THE COURT:  SUSTAINED.  THE RECORD SPEAKS FOR

5     ITSELF, MR. HAYES.

6          Q        BY MR. HAYES:  SO IS IT CUSTOMARY FOR YOUR

7     OFFICE TO PROVIDE A WITNESS ADVISEMENT STATEMENT AT

8     THE TIME OR ON OR ABOUT THE TIME IN WHICH FUNDS ARE

9     RELEASED TO THAT WITNESS?

10         A        WE PROVIDE THE WITNESS ADVISEMENT FORM TO

11    THE INVESTIGATING OFFICER CONCURRENT WITH HIM APPLYING

12    FOR THE WITNESS RELOCATION.

13         Q        SO PRETTY MUCH CONTEMPORANEOUSLY, THAT

14    PROCESS IS DONE?

15         A        CORRECT.

16         Q        AND THAT INFORMATION IS FORWARDED BACK TO

17    YOUR OFFICE ONCE THAT DOCUMENTATION IS COMPLETE?

18         A        YOU'RE TALKING ABOUT THE WITNESS ADVISEMENT

19    FORM?

.20        Q        YES, ALONG WITH ALL THE OTHER

21    DOCUMENTATION?

22         A        WELL, THE ONLY DOCUMENTATION THAT IS

23    REQUIRED TO RETURN TO US, SINCE WE RETAIN COPIES OF

24    EVERYTHING ELSE YOU HAVE IN YOUR POSSESSION, IS THE

25    WITNESS ADVISEMENT FORM.

26         Q        AND THAT'S --

27         MR. HAYES:  THAT'S ALL I HAVE, YOUR HONOR.

28         THE COURT:  MR. GRACE, ANY REDIRECT?

1        MR. GRACE:  NO FURTHER QUESTIONS, YOUR HONOR.

2        THE COURT:  CAPTAIN HARVETH, THANK YOU VERY MUCH.

3        MR. GRACE:  YOUR HONOR, WITH RESPECT TO THAT, WE

4  BELIEVE THAT THE PEOPLE ARE IN COMPLIANCE WITH ALL OF

5  THE DISCOVERY REQUESTS BY MR. HAYES.  WE DON'T HAVE

6  ANY OTHER WITNESSES, AND WE WOULD SUBMIT ANY ARGUMENT

7  ON THE PAPERS, MOVING PAPERS THAT WE PRESENTED TO THE

8  COURT.

9        THE COURT:  ALL RIGHT.

10        MR. HAYES, DO YOU WANT SOME ADDITIONAL TIME

11  TO FILE ANY ADDITIONAL ARGUMENT IN THIS MATTER, SINCE

12  YOU JUST GOT THESE MATERIALS TODAY?

13        MR. HAYES:  YES, YOUR HONOR.

14        I WOULD -- I JUST GOT A DECLARATION FROM

15  MR. STERNFELD, HE JUST DROPPED OFF TO ME, WITH REGARDS

16  TO ALL THESE FACTORS, OF HIS OFFICE BEING NOTIFIED --

17        THE COURT:  OKAY.

18        MR. HAYES:  -- ABOUT DISCOVERY.  IF I COULD GET

19  ANOTHER --

20        THE COURT:  WHAT DO YOU WANT, 30 DAYS?

21        MR. HAYES:  COULD I GET 45?  I APPRECIATE IT.

22        THE COURT:  MR. GRACE, ANY OBJECTION TO 45 DAYS?

23        MR. GRACE:  NO.  I'M GOING TO BE GONE THE LAST

24  TWO WEEKS OF AUGUST, GOING INTO SEPTEMBER.  SO ANYTIME

25  AFTER THAT.

26        THE COURT:  HOW ABOUT SEPTEMBER 13TH?

27        MR. HAYES?

28        MR. HAYES:  THAT'S FINE, YOUR HONOR.

11

Case 2:19-cv-00563-JAM-AC Document 1 Filed 04/01/19 Page 83 of 145

1         THE COURT: MR. GRACE, SEPTEMBER 13TH?

2         MR. GRACE: SEPTEMBER 13TH IS FINE, YOUR HONOR.

3         THE COURT: ALL RIGHT.

4            ALL FURTHER PROCEEDINGS, SEPTEMBER 13TH.

5           MR. HAYES, IF YOU WOULD -- ANY MOTIONS

6 YOU'RE GOING TO FILE, IF YOU WOULD GET THOSE FILED BY

7 SEPTEMBER THE 1ST, I'D APPRECIATE THAT.

8         MR. HAYES: 9-1? YES, I WILL.

9         MR. GRACE: YOUR HONOR, FOR THE RECORD, MAY I

10 HAVE A COPY PROVIDED, A COPY OF ANY DECLARATION?

11         THE COURT: I AM ASSUMING IF HE FILES IT IN A

12 MOTION, SINCE IT'S A DECLARATION OF HIS TRIAL

13 COUNSEL --

14         MR. HAYES: YEAH. I'LL FILE IT. YOU'LL RECEIVE

15 ONE, MR. GRACE.

16         THE COURT: OKAY.

17         MR. GRACE: THANK YOU, YOUR HONOR.

18         THE COURT: ALL RIGHT.

19

20             (PROCEEDINGS ADJOURNED.)

21

22

23

24

25

26

27

28



EXHIBIT



P.O. BOX 163029
SACRAMENTO, CA 95816-3029
Public: (916) 227-4191
Facsimile: (916) 227-4134

March 17, 2000

Gary Schram, Captain
Los Angeles County District Attorney's Office
210 W. Temple Street, Rm. 101
Los Angeles, CA 90012

RE:  California Witness Protection Program (CWPP)
     New CWPP Agreement #50/99-280 - Witness #19-334
     (Court #BA19714901)

Dear Captain Schram:

This letter confirms the approval of your agency's written request for witness
assistance dated 3/15/2000.  Within the next week, *CWPP Agreement* #50/99-280
stipulating the terms and conditions of the contract will be forwarded to your office for
signature.  Please have the *CWPP Agreement* signed by the district attorney or the deputy
district attorney designee and return it to the CWPP within five working days.  Below is
a brief summation of the terms and conditions of the *CWPP Agreement*:

Period of Assistance:    March 1, 2000 to August 31, 2000
Amount Reimbursable:     $1,800.00
Approved Services:       Relocation expenses; and semi-permanent lodging
                         monthly rent

The witness has been assigned *Witness Number #19-334*.  This number is to be used
in place of the witness' name on all future correspondence and reimbursement requests.
Please submit your reimbursement requests monthly following the directions outlined in
the *California Witness Protection Program Policy and Procedures Manual*.

If you have any questions, please feel free to call me at (916) 227-4191.

Sincerely,

JUDY CORNICK, Program Analyst
California Witness Protection Program
California Bureau of Investigation

For BILL LOCKYER
Attorney General



| SUSPENSE DATE | OFFICE OF THE DISTRICT ATTORNEY | |
|---|---|---|
| | COUNTY OF LOS ANGELES | |
| | *CONFIDENTIAL* | |

## WITNESS PROTECTION PROGRAM ASSISTANCE REQUEST

1. **REQUESTING AGENCY**

   Date: *14 March 2000*     Address: *7600 S. Broadway*

   Department: *L.A.P.D.*     *Los Angeles*

   Officer/Agent: *Det. A. Bernal*     Phone #: *213) 485-1383*

   DR/File #: *9912-25667*

2. **DESCRIPTION OF WITNESS(ES)**

   Name: *Hayes, Angela Lashell*     POB: *Kansas City, Mo*

   Aliases: *Hayes, Angela Michelle*     CII: _____

   DOB: *3·2·69*     CDL: ____

   FBI: *89783 0MA6*

   Description of other family and/or household members to be given witness protection assistance (include name, DOB, CDL, addresses, and relationship to witness)

   *Jovana Washington DOB: 5·14·87 (Daughter), Jovan Rossell 1·10·90, Son, Jovell Rossell, 1·10·90, Mario King Jr 11·25·93, Alezsha Hayes, 7·13·98*

3. Describe the circumstances of the crime(s) committed in this case and how the witness is involved (note any special significance to the deft(s) or the nature of their criminal activity such as street gang involvement, organized crime affiliation, etc.)

   *Vangela and Tiana Hayes were both discovered murdered in their residence. Angela Hayes has provided information against the suspect: Henry Hayes, her brother, and fears for the safety of herself and children. The suspect knows where Angela Hayes currently resides.*

4. Specifically, what will this witness testimony be and its importance to the case (i.e. eyewitness to murder and under what circumstances, co-conspirator and nature of involvement, etc.)

   *The witness will testify to suspects actions prior to the murder and after the murder. The witness has also identified the victims property which was pawned by the suspect.*

DA-1420-F—76W532P—Rev. 2/90   (Page 1 of 2)

5. Has this witness or family been threatened?  ☐ YES  ☑ NO

By whom: _____

Describe the threats; how they were delivered and how they were substantiated by the requesting agency: _NOTE: NOT AS OF THIS REQUEST. THE WITNESS FEARS THE SUSPECT DUE TO HIS VIOLENT BEHAVIOR AND PRIOR PHYSICAL HARM BY THE SUSPECT._

Do the deft(s) or their associates know where the witness lives, works, or goes to school?  ☑ YES  ☐ NO

6. If no threats, why do you feel this witness is endangered and must be relocated?
_SUSPECTS VIOLENT TEMPER / BEHAVIOR AND PRIOR PHYSICAL HARM._

Have funds been requested on this case before?  ☐ YES  ☑ NO

If so, name of witnesses and date funds were requested.

_____

7. Case legal #: _LACBA197149O1_     Charges: _2CTS 187 PC MURDER_
   Deft. Name: _HAYES, HENRY_     _1CT 273AB PC ASSAULT/DEATH_

8. Reliability of the witness (has the witnesses reliability been previously established in court, can witness provide credible, competent testimony, etc.)
_INFORMATION PROVIDED BY THE WITNESS HAS BEEN VERIFIED THROUGH THE INVESTIGATION._

9. Willingness of witness to testify without provided protection:
_MAY BE RELUCTANT - BUT STILL COOPERATE._

10. Is the witness/family currently receiving financial assistance from any governmental agency?
   ☑ YES  ☐ NO

It is hereby acknowledged and agreed these funds are requested for the emergency relocation of the witness(es) for the reasons outlined in this request. I understand only those expenses approved below, in the indicated amounts are reimbursable only through the subsequent submission of original receipts, unless otherwise indicated in this agreement. No other substitution of expenses is allowed. I have received approval from my department to seek these funds from _____ _Sgms 4/179/7_ (supervisor).

Signed _____ _22803_ Date _3·13·00_

**FOR OFFICIAL USE ONLY — DO NOT WRITE BELOW THIS LINE**

Agreement between parties as how the funds will be utilized and amount(s) authorized:

Total amount approved: _____ Approving authority: _____ Date _____

DA-1420-F—76W532P—Rev. 2/90   (Page 2 of 2)

Mail to:   California Department of Justice
California Bureau of Investigation/CWPP
P.O. Box 163029
Sacramento, CA 95816-3029
Attn: CWPP Program Analyst

| [X] NEW | RENEWAL | AMENDMENT (NO.      ) | AGREEMENT NO.    50/99-280 | COURT/AGENCY NO.   BA1971490 |
|---|---|---|---|---|

| District Attorney's Office<br>Los Angeles County District Attorney's Office | District Attorney Representative<br>Gary Schram, Captain |
|---|---|
| Address<br>210 W. Temple Street, LA, CA 90012 | Telephone Number<br>(213) 974-3608 |
| Law Enforcement Designee or Coordinator<br>Gary Schram, Captain | Telephone Number<br>(213) 974-3608, fax# (213) 633-0936 |

## DIGEST OF CONTRACT (REIMBURSABLE SERVICES PROVIDED BY THE CWPP)

The California Witness Protection Program (CWPP), Title 7.5, Section 14021-14033, of the California Penal Code, will provide financial assistance to the Los Angeles County District Attorney's Office for the protection of one witness identified as *Witness #19-334*, and four family members, endangered as a result of their involvement in a criminal matter.

Terms and Conditions: Reimbursement will be for relocation expenses; and semi-permanent lodging monthly rent, in accordance with the *California Witness Protection Program Policy and Procedures Manual* governing witness protection services.

*(Each district attorney's office must maintain a record of original receipts for expenditures applied for the protection of witnesses).*

DOLLAR AMOUNT   $1,800.00   *(Chapter 50/99)*   PERIOD OF PERFORMANCE   3/01/00   TO   9/31/00

## REASON FOR CONTRACT (IDENTIFY SPECIFIC PROBLEM MAKING THE CONTRACT NECESSARY)

The life of the witness is in danger due to their involvement in a criminal matter. CWPP funds will provide for the witness' continued protection until the case is concluded or financial assistance is no longer deemed necessary by the district attorney's office or as determined by the CWPP.

## DESCRIBE THE SERVICE WHICH WILL RESULT

Financial assistance provided to the threatened witness through the CWPP will result in the prosecution of an individual involved in the crime of 187 PC. Financial assistance through the CWPP will ensure criminal prosecutions that would, in most cases, be impossible without the cooperation of the threatened witness.

## WERE OTHER FUNDING SOURCES UTILIZED BEFORE APPLYING WITH THE CWPP?

Yes ☐   No ☒

Authorized Signature of District Attorney's Office

3-30-2000
Date

Signature of CWPP Program Analyst

March 17, 2000
Date

CWPP 2 (10/98)



EXHIBIT

<u>DECLARATION</u>

I am informed and do hereby declare that the following is true and correct:

I, Robert Grace am a prosecutor employed by the Los Angeles County District Attorney's Office.

I was the assigned prosecutor in the case of **People v. Henry Hayes, BA197149.**

I am not aware of any payments made directly to Angela Hayes by the Los Angeles Police Department or the Los Angeles County District Attorney's Office.

Angela Hayes applied to the Los Angeles County District Attorney's Office, Victim Witness Assistance Program for funds to relocate her residence after it was discovered that defendant Hayes had attempted to hire someone to kill her.

The Los Angeles County District Attorney's Office, Victim Witness Assistance Program paid first and last month rent to the landlord of Angela Hayes to facilitate her move to a new apartment.

I believe that this fact was turned over as part of the discovery process to defense counsel for defendant Hayes.

I DECLARE UNDER PENALTY OF PERJURY under the laws of the State of California that the above statement is true and correct.

DATED:

ROBERT GRACE
Deputy District Attorney



EXHIBIT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. 107      HONORABLE GEORGE G. LOMELI, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                   PLAINTIFF,          )
                                       )
        VS.                            )   NO. BA197149
                                       )
01 HENRY CEPHUS HAYES,                 )
                                       )
                   DEFENDANT.          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

OCTOBER 2 AND 22, 2015

APPEARANCES:

FOR THE PEOPLE:          JACKIE LACEY, DISTRICT ATTORNEY
                         BY:  ROBERT GRACE, DEPUTY
                         211 WEST TEMPLE STREET
                         SUITE 200
                         LOS ANGELES, CALIFORNIA  90012

FOR THE DEFENDANT:       JANICE Y. FUKAI, ALTERNATE PUBLIC
                         DEFENDER
                         BY:  RICHARD L. STERNFELD, DEPUTY
                         35 HALL OF RECORDS
                         320 WEST TEMPLE STREET
                         LOS ANGELES, CALIFORNIA  90012



CHRISTINE TAYLOR, CSR NO. 6373
OFFICIAL COURT REPORTER

```
 1    CASE NAME:              PEOPLE VS. HAYES
 2    CASE NO.:               BA197149-01
 3    LOS ANGELES, CALIFORNIA  FRIDAY, OCTOBER 2, 2015
 4    DEPARTMENT NO. 107       HON. GEORGE G. LOMELI, JUDGE
 5    REPORTER:               CHRISTINE TAYLOR, CSR NO. 6373
 6    TIME:                   11:48 A.M.
 7    APPEARANCES:
 8        Defendant Henry Hayes, present with counsel,
 9        Richard Sternfeld, Deputy Alternate Public
10        Defender; Robert Grace, Deputy District
11        Attorney, representing the People of the
12        State of California.
13
14              (The following proceedings were held
15              in open court:)
16
17        THE COURT:  All right.  We have the matter of People
18    versus Henry Hayes.  We have Mr. Sternfeld on behalf of
19    Mr. Hayes, and we have --
20              Counsel, if you would, for the record.
21        MR. GRACE:  Deputy District Attorney Robert Grace,
22    representing the People.
23        THE COURT:  Thank you very much.
24              This is here pursuant to an order that Judge
25    Lance Ito made on February 11, 2015, wherein I see that it
26    appears that there were no appearances by counsel on that
27    date; it appears Mr. Hayes was present.  But Judge Ito
28    issued an order that the prosecution -- and I'll quote:
```

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

1    "The prosecution and the defense

2    trial counsel shall examine their files to

3    locate any of the requested 1054.9 materials,

4    as is their obligation, should any of the

5    requested materials be available in their

6    respective file."

7    Mr. Hayes, just for the record -- so the record

8    is clear, you're seeking this discovery -- in other words,

9    is this in preparation for a habeas?

10    THE DEFENDANT:  Yes, Your Honor.  Good morning.

11    THE COURT:  Good morning.

12    THE DEFENDANT:  On about August the 11th, I filed a

13    continuum habeas corpus, 228142, with the California

14    Supreme Court.  That is currently pending.  I did advise

15    them, under *People v. Duvall*, why I did not have the

16    appropriate documentation.  So that case has already been

17    filed.

18    THE COURT:  Okay.  I see that Mr. Hyman Sussman, in a

19    letter, responded on behalf of the DA's office that he was

20    denying any discovery -- or to comply with any discovery

21    because he felt that good cause had not been established,

22    in that he felt that Mr. Hayes was requesting discovery in

23    a piecemeal fashion, and I'm paraphrasing here.

24    All right.  Let me hear from Mr. Grace, first

25    of all, if you would.

26    MR. GRACE:  Well, first of all, Your Honor, we

27    stand -- I stand behind Mr. Sussman's response that the

28    court briefly outlined; but, also, I did take a moment to

1 | review the request of Mr. Hayes.

2 | THE COURT:  Which is specifically what?  Briefly, if

3 | you would.

4 | MR. GRACE:  He wanted rap sheet material on specific

5 | witnesses.  And the witnesses that he's requesting rap

6 | sheet information for, there was no *Brady* material to turn

7 | over at the time.

8 | And we're prevented by statute, and it's a

9 | misdemeanor offense, to provide Mr. Hayes with any rap

10 | sheet information on witnesses, and so we're not going to

11 | comply with that order because I would then be against --

12 | it would be against state law.

13 | THE COURT:  All right.  Do you want to comment,

14 | Mr. Sternfeld?

15 | MR. STERNFELD:  Well, Your Honor, I would like to

16 | indicate to the court that at some point, pursuant to

17 | Mr. Hayes's request, my office turned over our file to him.

18 | That's number one.

19 | Number two, I believe he further requested some

20 | additional information about any interviews that we did

21 | with some witnesses that were listed in the discovery that

22 | we obtained from the district attorney's office.

23 | And I don't believe that we interviewed one or

24 | two of those witnesses that he referred to largely because,

25 | at some point long before the trial started, I think we

26 | were told that they would not be called to the witness

27 | stand.

28 | There was one or two women that did testify

1   with respect to contact with Mr. Hayes outside of his

2   marriage.

3           One was a woman that Mr. Hayes knew from the

4   San Bernardino Riverside area that did testify, and we had

5   all the materials on her.  She was, I believe, a

6   schoolteacher.

7           So I don't have any discovery for Mr. Hayes

8   with respect to the independent investigation that we

9   prepared -- that we did, if the request has to do with

10  further interviews of any women that were contacted by the

11  DA's office at the time that this investigation was going

12  on, in 2000, 2001, 2002, 2003, I believe.

13          THE COURT:  All right.  So is it your representation

14  that you turned everything over at this point?

15          MR. STERNFELD:  Yes.  I mean, we've turned our file

16  over.  I, again, years after we did that, scanned all of

17  the information that I had in regard to investigation

18  reports that were prepared by my office.  I didn't see any

19  of those reports --

20          THE COURT:  All right.

21          MR. STERNFELD:  -- that referred to what Mr. Hayes

22  had requested.

23          You know, I will certainly make a

24  representation to the court and to Mr. Hayes and to

25  Mr. Grace, I will do that again --

26          THE COURT:  All right.

27          MR. STERNFELD:  -- and if I have specific names, I

28  don't recall their names off the top of my head, I

1    certainly would do that again based upon Mr. Hayes's

2    presence here, Mr. Grace, and the court being here, and

3    come back at a subsequent date.  That's not a problem.

4         THE COURT:  Okay.  We will deal with that in a few

5    moments.  I'll set a subsequent date with respect to giving

6    you a further opportunity to re-examine your file, see if

7    any of the information that Mr. Hayes is requesting is

8    contained within those files that you have not -- or have

9    yet to turn over.

10             It's your representation you have, but you'll

11   just out of the abundance of caution recheck your files.

12        MR. STERNFELD:  Absolutely.

13        THE COURT:  Mr. Hayes, let me ask you, with respect

14   to the rap sheet, why do you need it in preparation for

15   your habeas?

16        THE DEFENDANT:  Okay.  Your Honor, the witness

17   Francesca Woods did testify during trial as to certain

18   specific dates and times in which she reported that I

19   visited her while she was incarcerated either in prison or

20   in a jail system.

21             As I continuously argued with my counsel, and

22   Jeri Polen was also co-counsel with Mr. Sternfeld on the

23   case, I advised Ms. Polen I have no idea who Ms. Woods is.

24   I have no prior knowledge of her, who she is or where she

25   comes from.

26             But, in and of itself, as we can see from trial

27   counsel, no investigation was done to even clarify those

28   issues with the witness or with Ms. Woods.  So that is one

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

```
1    of the issues that I have.  It's a constitutional issue
2    under Mooney v. --
3          THE COURT:  Yes, but if there is nothing that exists
4    because no interviews were conducted, then it is what it
5    is.  I mean, if you raise an issue of ineffective
6    assistance of counsel, what have you -- but if an interview
7    didn't exist because it never took place, that's what it is
8    at this point.
9          MR. STERNFELD:  Can I just get clarification?
10         THE COURT:  Yes.
11         MR. STERNFELD:  I don't have an independent
12   recollection of this, but was Ms. Woods called to the
13   witness stand at trial?
14         THE DEFENDANT:  Yes.
15         MR. GRACE:  Okay.  So there were three women that
16   were called, Talika Byers, Francesca Woods, and then the
17   third woman whose name escapes me, but of those three, Your
18   Honor, these are all women who are not percipient witnesses
19   to the crime.
20         THE COURT:  Okay.
21          , MR. GRACE:  They are motive witnesses.  None of those
22   women had prior convictions that could have been used to
23   impeach them and --
24         THE COURT:  You're representing that as an officer of
25   this court --
26         MR. GRACE:  Correct.
27         THE COURT:  -- after you've examined whatever
28   criminal history they may have had; is that correct?
```

1    MR. GRACE:  So what I'm saying is at the time there

2    was no impeachment evidence which we would been able to

3    turn over to defense counsel, and now it would be a

4    misdemeanor offense to turn over any of the -- any

5    subsequent crimes that they may have committed since his

6    conviction.

7    THE COURT:  Well, they would be irrelevant, in any

8    event.

9    MR. GRACE:  Right.

10   MR. STERNFELD:  My recollection now is that Mr. Hayes

11   did request that our office scan our file, investigate our

12   file, look through our file to see if we had spoken to

13   Ms. Woods, if we had investigated her.

14   THE COURT:  Right.

15   MR. STERNFELD:  I will double-check that.  I remember

16   that name.  Ms. Byers did testify.  I'm sure that we did

17   interview her or attempt to interview her.

18        The third woman, do you have the name,

19   Mr. Hayes?

20   THE DEFENDANT:  There were only two witnesses.

21   Mr. Grace said three, there were only two witnesses.

22   MR. STERNFELD:  So it's two people.

23        I will look for all of the information we have

24   on Ms. Woods and see if there is anything that we did in

25   order to facilitate investigating that.

26        As Mr. Grace properly points out, my

27   recollection is these were not percipient witnesses to the

28   crime.  In fact, there were no percipient witnesses to the

1   crime, Your Honor.  It was a circumstantial evidence case.

2   And their purpose -- the DA's purpose in putting them on

3   was issues regarding motive and issues regarding

4   inconsistent statements that Mr. Hayes might have given to

5   the police or other authorities that these women might have

6   contradicted or something of that nature.

7          THE COURT:  Okay.  All right.

8          Do you have anything to add, Mr. Hayes?

9          THE DEFENDANT:  Yes, Your Honor.

10          And I think Mr. Grace -- the court will take

11   judicial notice of *People v. Rose*, 2014, 226 Cal.App.4th

12   996, at 1007, those rap sheets are part of the 1054.1(d)

13   and (e) materials that are to be turned over to a defendant

14   prior to trial, and under 1054.9, those materials were what

15   I was to receive at the time of trial, so I don't see where

16   Mr. Grace is trying to backpedal now, either if it was

17   impeaching, she made a statement, to her credibility --

18   that she met me or that I met her, that is a credibility

19   issue.  That is a constitutional issue that I'm arguing,

20   Your Honor.

21          THE COURT:  Well, there are two things that I see

22   here.  First of all, you stated something to the effect,

23   and I'm not sure if I understood you correctly, initially,

24   that because someone was incarcerated, one of these women,

25   purportedly, that they couldn't have been percipient or

26   been privy to a statement made, I'm not sure I understood.

27          But that's what you stated, something about

28   incarceration; is that correct?

1    THE DEFENDANT:  No, Your Honor.  What I stated was

2    that she testified under oath that I came to her aid while

3    she was incarcerated.

4       THE COURT:  Oh, okay.  That's something different.

5       THE DEFENDANT:  Yeah.

6       THE COURT:  This is what the court is going to do.

7          You look through your files.  I'm going to set

8    a subsequent date.

9          You represented to this court that there is

10   nothing in the rap sheets.  I want you to produce those rap

11   sheets to this court so that the court can take a look at

12   them, whether or not there's anything in there that should

13   have been turned over for purposes of impeachment with

14   respect to the relevant dates.  Obviously, anything

15   subsequent to that is irrelevant.  So by the next court

16   date, I would like you to produce those rap sheets for this

17   court's review.

18          And you will, Mr. Sternfeld, look through your

19   files with respect to any interviews that may exist that

20   fall within the request made by Mr. Hayes.

21          Mr. Hayes, I'm going to order you out for the

22   next court date that I'll set in just a moment.  All right?

23       THE DEFENDANT:  Oh, okay.

24       THE COURT:  Yes?

25       THE DEFENDANT:  I'm just trying to get clarification

26   of what --

27       THE COURT:  This is what Mr. Sternfeld is going to

28   do.

1           THE DEFENDANT:  I understand the order.

2           THE COURT:  And, of course, with respect to the rap

3   sheets, the court is going to take a look at them.  The

4   court itself will take a look at them and make a record

5   with respect to the rap sheets, make sure they're

6   memorialized in some way.

7                It's a practice that courts engage in often, to

8   determine whether or not there is anything in there, within

9   the relevant dates of the incident, that should have been

10  turned over to you which would have -- could have been used

11  to impeach these individuals.

12               All right?

13          THE DEFENDANT:  Thank you, Your Honor.

14          THE COURT:  All right.  So, Mr. Grace and

15  Mr. Sternfeld, you know what your responsibilities are.

16          MR. STERNFELD:  Yes.

17          THE COURT:  What date would you guys like?

18          MR. STERNFELD:  Well, I'm going to start a trial

19  probably on the 28th or 29th at the Airport court.  Do you

20  want to come back on the 22nd of October?

21          THE COURT:  How about that, Mr. Grace?

22          MR. GRACE:  That's fine.

23          THE COURT:  Can we do it at 8:30?

24          MR. STERNFELD:  Your Honor, I'm going to put that

25  clearly in my file.  I do apologize to the court.

26          THE COURT:  I understand, it's not like you.

27               So Mr. Hayes is ordered out for that date, if

28  you will.

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

1   THE BAILIFF: Yes.

2   THE DEFENDANT: Thank you, Your Honor.

3   MR. GRACE: October 28, Your Honor?

4   THE COURT: The 22nd; wasn't it, Madam Reporter?

5   THE REPORTER: The 22nd.

6   MR. GRACE: Thank you.

7   THE COURT: We'll stand in recess.

8 //

9 //

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1    CASE NAME:              PEOPLE VS. HAYES
 2    CASE NO.:               BA197149-01
 3    LOS ANGELES, CALIFORNIA THURSDAY, OCTOBER 22, 2015
 4    DEPARTMENT NO. 107      HON. GEORGE G. LOMELI, JUDGE
 5    REPORTER:               CHRISTINE TAYLOR, CSR NO. 6373
 6    TIME:                   8:55 A.M.
 7    APPEARANCES:
 8         Defendant Henry Hayes, present with counsel,
 9         Richard Sternfeld, Deputy Alternate Public
10         Defender; Robert Grace, Deputy District
11         Attorney, representing the People of the
12         State of California.
13
14              (The following proceedings were held
15              in open court:)
16
17         THE COURT:  Let me call the matter of the People
18    versus Henry Hayes.  Mr. Hayes is present in court,
19    Mr. Sternfeld on behalf of Mr. Hayes, and Mr. Grace on
20    behalf of the People.
21              A couple of issues that we have to address that
22    I put it over from October 2.
23              First of all, the DA -- excuse me, the defense
24    was to recheck their file regarding any interviews that may
25    have taken place with the two witnesses in question that
26    Mr. Hayes was inquiring about.
27              Let me ask you, Mr. Sternfeld, did you have an
28    opportunity to do that?
```

1          MR. STERNFELD:  I did, Your Honor.  My paralegal,

2     Mr. Torres, and I went through our system that categorizes

3     investigation requests and investigation reports with

4     regard to Ms. Woods, who is the witness at issue.

5          I don't remember the other witness.  If the

6     court could refresh my recollection, if the court has that

7     written down.

8          THE COURT:  Well, I have Ms. Woods.

9          MR. STERNFELD:  Okay.

10          THE COURT:  Who is the second one, Mr. Grace, do you

11     know?  Do you recall?

12          MR. GRACE:  Umm, it may be Talika Byers, but I'm not

13     sure.

14          THE COURT:  Mr. Hayes?

15          THE DEFENDANT:  No, it was only the one.  It was only

16     Francesca Woods who was in question.

17          THE COURT:  All right.

18          MR. STERNFELD:  So we did take the time to look

19     through our file with respect to the investigation reports

20     and the investigation request.  There was nothing in there

21     with respect to Ms. Woods.

22          I did obtain a copy of her testimony at trial,

23     where Mr. Grace put her on to identify a relationship she

24     had with Mr. Hayes, and that consisted of what would,

25     arguably, be sex for money, and a completely non-sexual

26     relationship that would be characterized as a friendly

27     relationship, or a relationship wherein Mr. Hayes was

28     concerned about her, taking her to lunch or dinner and

```
 1    talking to her, nothing to do with any type of sexual
 2    encounters.  I mean, that was part of the relationship, but
 3    there were also non-sexual parts of the relationship.
 4              And Ms. Polen was the individual lawyer who
 5    cross-examined her, and some of the testimony certainly was
 6    favorable to us in terms of how Mr. Hayes treated her, some
 7    of it obviously could have been negative with respect to
 8    the issue of Mr. Hayes being married and allegedly seeking
 9    other types of sexual encounters outside the marriage.
10              In any event, I didn't find anything that we
11    did in order to independently investigate whatever
12    statements she made to the People before trial.
13              The other issue was that in a civil suit that
14    Mr. Hayes apparently filed with respect to the issues
15    regarding payments that were made on the insurance policy,
16    the life insurance policy that his wife had, there was
17    evidence that we had before the trial that was turned over
18    by the People with respect to a claim, or an inquiry that
19    Mr. Hayes made with regard to that policy.  It was a
20    one-time inquiry.
21              And we did not have any information at that
22    time, I believe, that had to do with the family of
23    Mr. Hayes's wife, the grandparents of one of the victims,
24    the child, or the parents of Mr. Hayes's wife.
25              The parents of Vangela Hayes did make a claim
26    and they were paid on the insurance policy, I think it was
27    a total of $160,000.
28              THE COURT:  All right.
```

| | |
|---|---|
| 1 | MR. STERNFELD: We did not have any information about |
| 2 | that at the time, and the evidence I have of that is |
| 3 | Mr. Hayes obtained that apparently through a civil lawsuit, |
| 4 | and the file that we provided to Mr. Hayes, according to |
| 5 | Mr. Hayes, did not contain those documents. |
| 6 | So those are the representations I can make to |
| 7 | the court. |
| 8 | THE COURT: All right. And the other issue had to do |
| 9 | with respect to -- I believe Mr. Hayes was inquiring about |
| 10 | Ms. Woods and whether or not there was anything in terms of |
| 11 | discovery regarding her criminal record. |
| 12 | And, Mr. Grace, I've had a chance to look at |
| 13 | what has been presented to this court, and it looks like a |
| 14 | history of her criminal record, a rap sheet, if you will. |
| 15 | What is your position with respect to the |
| 16 | criminal record? |
| 17 | MR. GRACE: Your Honor, my position would be that |
| 18 | anything prior to the trial, which I believe was in the |
| 19 | year 2003 -- |
| 20 | THE COURT: Yes. |
| 21 | MR. GRACE: -- would be discoverable to the |
| 22 | defendant. |
| 23 | THE COURT: Yes. |
| 24 | MR. GRACE: And I believe that the court can redact |
| 25 | information related to, you know, addresses and things of |
| 26 | that nature, and that he could get just the facts of the |
| 27 | convictions. |
| 28 | It's my recollection that defense counsel was |

1    aware that Ms. Woods had suffered convictions related to

2    prostitution, misdemeanor prostitutions, and that felony

3    conviction for possession of a controlled substance.

4          THE COURT:   Right.  And that's what this court was

5    able to see from the criminal record, that most of the

6    convictions have to do with prostitution and/or 11350 of

7    the Health and Safety Code.

8                The one conviction that I see may go to moral

9    turpitude appears to have occurred sometime in 2009 --

10         MR. GRACE:   That's correct.

11         THE COURT:   -- well outside the relevant dates with

12   respect to the trial in this matter.

13               So with respect to what exists prior to the

14   trial, the information that may have existed has to do with

15   11350s and 647(b)s, prostitution, and that's all we have;

16   everything thereafter is irrelevant.

17               Yes, sir?

18         THE DEFENDANT:   No, that's perfectly fine, Your

19   Honor.

20               My specific concern is a document, also, I

21   shared with Mr. Sternfeld upon his visit with me yesterday.

22   The district attorney did do an interview with Ms. Woods

23   and memorialized that with an investigation report.

24               That investigation report, I did -- as I shared

25   with Mr. Sternfeld, again, was not turned over to myself

26   until March 15 of this year.  And Mr. Sternfeld also --

27   that was not part of the defense record.

28               My position with the rap sheet deals with her

1    allegations at trial, as well as in that investigation

2    report, as to times in which she alleges that I visited her

3    or she was apparently incarcerated.

4         So there is conflict there, because, again, at

5    no time did I ever visit Ms. Woods; and, again, my

6    recollection of her is void.

7         MR. STERNFELD:  Your Honor, I did talk to Mr. Hayes

8    about the report that was generated, apparently, by the

9    DA's office, and I didn't have any independent recollection

10   if we had that report.  I told Mr. Hayes that he should

11   represent to the court that he obtained it independently of

12   our file.  That's what he's saying.

13        Since we turned over our entire file to

14   Mr. Hayes, and he indicates to me, and he's indicating to

15   the court, I believe, that he did not have -- or we did not

16   have that investigative report by the DA's office, I can

17   only tell the court that I haven't looked through the

18   entire file again, but he indicates that we were not in

19   possession of that at the trial or prior to trial with

20   respect to the DA's office interviewing her.

21        And if we did have that and she did make

22   allegations of having Mr. Hayes put money on her books or

23   visiting her while incarcerated, we certainly probably

24   would have made an attempt to find out if, in fact, that

25   was true; that if, in fact, we could trace any deposits

26   that were put on the -- on Ms. Woods', you know --

27        THE DEFENDANT:  Trust account.

28        MR. STERNFELD:  -- trust account, or account at the

1    county jail, or if he visited her, we would be able to

2    subpoena those documents, and I'm sure we probably would

3    have done that if we had that kind of knowledge.

4              But I don't have my file in front of me.  It

5    would take me a fairly long time to see if we even had that

6    investigative report generated by the DA's office.

7              THE COURT:  Mr. Grace, do you have anything to add?

8              MR. GRACE:  No, Your Honor.

9              This witness was thoroughly questioned and

10   interviewed and the circumstances of her relationship with

11   Mr. Hayes were well known to the defense, and the fact that

12   Mr. Hayes had had contact with her.

13             He was a minister, and he had contact with her

14   both inside and outside of jail, so I don't think the facts

15   regarding that were not known to either the defense or the

16   prosecution or that there had not been ample discovery

17   turned over about Ms. Woods, because she was --

18             Again, she was not a percipient witness, she

19   didn't know anything about the matters related to the

20   murder, she was a collateral witness only on the issue of

21   motive.

22             THE COURT:  All right.  Anything to add, Mr. Hayes?

23             THE DEFENDANT:  Yes.

24             Well, again, the issue that I'm having is

25   because Ms. Woods stated to the District Attorney's office

26   that she, at some point prior to her interview with them in

27   2003, had a roommate by the name of Sheri McMillan, who

28   made a representation that she was my daughter's aunt, and

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

1   that the family allegedly gave this Ms. McMillan a dress

2   belonging to my daughter.

3           And that raised a red flag in respect of this

4   coincidental contact with Ms. Woods and Ms. McMillan,

5   bringing to the point that: A, this is not Teanna's -- was

6   not Teanna's aunt; B, that, there was a highly probable

7   connection of influence by the Harris family, or someone on

8   that side of the prosecution table, to elicit this

9   information from Ms. Woods.

10          Because, again, as I'm testifying to this court

11  today, and as I testified and conveyed to my trial counsel,

12  I have no recollection of any relationship with this woman

13  at all, and that's where I'm -- what I'm standing on today,

14  and did before trial.

15      THE COURT:  The thing is, Judge Ito, who basically

16  made the order to both counsel to check their files with

17  respect to the discovery he sought, is seeking -- this

18  court is following up on that, and what this court is able

19  to glean from the comments by both counsel is there is

20  nothing to be turned over.

21          Mr. Sternfeld has checked his file.  There is

22  nothing to be turned over with respect to the discovery you

23  seek, as well as with the rap sheet we discussed.  The

24  court has had an opportunity to look at the rap sheet.

25          I understand what your argument is, but, again,

26  it doesn't really go to discovery.  Unless there is

27  something else that I'm missing here in terms of discovery,

28  there is nothing to be turned over.

1    I've ordered already, the court reporter, at
2    least I'm making the order, that you get copies of today's
3    transcript, the proceedings, and the ones that occurred on
4    October 2, 2015.

5    But that's what we have. There's nothing more
6    to investigate regarding the discovery that you're seeking.

7    THE DEFENDANT: Well, I understand that. Yes, that
8    was my primary issue.

9    THE COURT: Okay.

10   THE DEFENDANT: And, again, it's very ironic.

11   And my issue is, too, Your Honor --

12   THE COURT: Yes?

13   THE DEFENDANT: -- in post-conviction, I had a death
14   penalty case, and for a death penalty case to transpire and
15   for witnesses not to be fully vetted by both -- you know,
16   Mr. Grace is contending that he fully vetted Ms. Woods,
17   that being known to my defense -- not fully vetting a
18   witness who has come in and has something to do with my
19   life on a death penalty case is disturbing.

20   THE COURT: Okay.

21   THE DEFENDANT: Again, that's where I'm standing, as
22   far as the constitutionality of certain aspects that I'm
23   raising in my habeas corpus.

24   THE COURT: Right.

25   THE DEFENDANT: And it goes to -- that goes to the
26   issue of her credibility and what she's saying and what
27   she's alleging.

28   I'm just bringing my post-conviction around to

1    line up with what the U.S. Supreme Court has announced.

2         THE COURT:  Did Judge Ito ever rule on your habeas

3    corpus on it?

4         THE DEFENDANT:  Yes.

5         THE COURT:  And so I understand what you're arguing,

6    but there's nothing more than this court can do at this

7    point.

8         THE DEFENDANT:  I understand.

9         THE COURT:  You're just trying to explain --

10        THE DEFENDANT:  The rap sheet.  And as long as

11   everything is on the record, I'm satisfied.

12        THE COURT:  And you'll get copies of the transcripts

13   as soon as they're ready.

14        THE DEFENDANT:  And the rap sheet has?

15        THE COURT:  There is nothing there to be turned over.

16             I mean, the only one that I really saw that

17   you're not aware of, and it's a burglary conviction, but

18   that occurred in 2009, outside the relevant dates of this

19   trial.

20        THE DEFENDANT:  I understand.  But my issue is was

21   she, in fact, incarcerated in 1996.  That's clearly -- the

22   rap sheet is going to give that information.

23        THE COURT:  Well, you know what?  She did some time

24   on this.

25             Mr. Grace, do you know?

26        MR. GRACE:  Your Honor, of course you know that the

27   rap sheet doesn't necessarily --

28        THE COURT:  It doesn't.  And that's my problem,

1   because it won't really indicate whether she was in custody

2   or not.  It will show you that she was convicted and that

3   she may have been done some time.

4            What year are you talking about?  1996?

5            THE DEFENDANT:  1996.

6        THE COURT:  All right.  We're in 1998, and I'm

7   looking at she served some time in 1998, 1997, 1996, she

8   did five days; but, again, it doesn't tell you the exact

9   dates, what you're looking for.

10           That's all I have.  She did five days and was

11  placed on 24 months probation for a prostitution

12  conviction.

13       THE DEFENDANT:  Like I say, under Penal Code Section

14  1325 and Penal Code Section 13102, it's pretty much clear

15  that the data is only limited to --

16       THE COURT:  Right.  And that's all I have with

17  respect to the date that you're asking about, 1996 -- the

18  year, I should say.

19       THE DEFENDANT:  For the record, can we verify this is

20  the same Francesca Woods with her date of birth?

21       THE COURT:  I'm looking at a photograph of her.  It

22  appears to be the individual.  Obviously, I'm not familiar

23  with the photograph, but just looking at the indicia with

24  respect to the description and so forth.

25       THE DEFENDANT:  For the record, just to verify --

26  and, again, that does not look like the Francesca that --

27  that's what I'm saying.

28       THE COURT:  She may look different when she's

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

1  working, because she obviously has a number of prostitution

2  convictions.

3          Mr. Grace, can you shed any light on this

4  issue?

5      MR. GRACE:  It is the People's representation that

6  this is the one and same Francesca Woods based upon the

7  prostitution convictions that we were aware of back at the

8  time of the trial.

9          Again, we want to make sure that that --

10  Mr. Hayes doesn't have any identifying information on this

11  person so that he can make contact with her, under the

12  rules, but as far as -- I can represent to the court that

13  this is the one and the same person.

14      THE COURT:  Who appeared in the trial as a collateral

15  witness?

16      MR. GRACE:  Yes.

17      THE DEFENDANT:  Under 1054.1(f), the only thing I'm

18  not allowed is their address and telephone number.

19      THE COURT:  That may well be, sir, but your question

20  was whether it's the same individual that appeared in

21  trial, and the representations made by the prosecution, as

22  an officer of the court, he has stated it's the same

23  individual who appeared and testified as a collateral

24  witness.

25          So you're not entitled to -- you're right,

26  you're citing the right section, but you're not entitled to

27  the information in the rap sheet or the criminal history.

28      THE DEFENDANT:  I know.  All I'm asking for is the

1    date of birth.

2      THE COURT:  Counsel?  I think that that probably is

3    not a problem, in terms of --

4      MR. GRACE:  Yeah, you know, if the court feels that

5    that is proper --

6      THE COURT:  Yes, I -- do you want me to give it to

7    him?

8      MR. GRACE:  If the court would do so.

9      THE COURT:  Do you want to write this down?

10      THE DEFENDANT:  Yes, Your Honor.

11      THE COURT:  February 18, 1962.

12      THE DEFENDANT:  Thank you, Your Honor.

13      THE COURT:  You're welcome.

14        All right.  Thank you, gentlemen.

15      MR. GRACE:  Thank you, Your Honor.

16      MR. STERNFELD:  Thank you, Your Honor.  If you need

17    anything else or something comes up, just contact me.

18      THE COURT:  Mr. Grace, do you want this back?

19      MR. GRACE:  Yes, Your Honor.

20    //

21    //

22

23

24

25

26

27

28

REPRODUCTION PER GOVERNMENT CODE SECTION 69954(D) ONLY

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2               FOR THE COUNTY OF LOS ANGELES

 3   DEPARTMENT NO. 107      HONORABLE GEORGE G. LOMELI, JUDGE

 4
     THE PEOPLE OF THE STATE OF CALIFORNIA,  )
 5                                           )
                    PLAINTIFF,               )
 6                                           )
          VS:                                )   NO. BA197149
 7                                           )
     01 HENRY CEPHUS HAYES,                  )   REPORTER'S
 8                                           )   CERTIFICATE
                    DEFENDANT.               )
 9   _____)

10

11          I, Christine Taylor, Official Reporter of the

12   Superior Court of the State of California, for the County

13   of Los Angeles, do hereby certify that the foregoing pages,

14   1 through 24, inclusive, comprise a full, true, and correct

15   transcript of the proceedings held in the above-entitled

16   matter on October 2 and 22, 2014.

17

18          Dated this 26th day of October, 2015.

19

20          _____
            CHRISTINE TAYLOR, RPR, CRR, CSR NO. 6373
21          OFFICIAL COURT REPORTER

22

23

24

25

26

27

28
```



EXHIBIT

1        A.    I HAD MET WITH HIM FACE TO FACE TO TALK

2   ABOUT THE BENEFITS, AND THEN AFTER THE DETECTIVE HAD

3   TOLD ME THAT --

4        Q    WELL --

5        MR. STERNFELD:  I AM GOING TO -- SORRY,

6   YOUR HONOR.

7        THE COURT:  SUSTAINED.

8             NEXT QUESTION.

9        THE WITNESS:  OKAY.

10       Q    BY MR. GRACE:  YOU INDICATED THAT YOU MET

11  WITH THE DEFENDANT, HENRY HAYES?

12       A    UH-HUH, YES.

13       Q    AND AT THAT MEETING DID YOU DISCUSS AGAIN

14  THE -- THE TERMS OF THE POLICY?

15       A    YES.

16       Q    OKAY.

17            AND ULTIMATELY DID THE -- WAS THE DEFENDANT

18  ALLOWED TO COLLECT ON THE POLICY AT ANY POINT?

19       MR. STERNFELD:  OBJECTION.  BEYOND THE KNOWLEDGE

20  OF THIS WITNESS' TESTIMONY.

21       THE COURT:  REPHRASE THE QUESTION.  FOUNDATION

22  QUESTION.

23       Q    BY MR. GRACE:  WOULD YOU HAVE BEEN THE

24  PERSON WHO WOULD HAVE HAD TO SIGN OFF OR APPROVE FOR

25  ANYONE TO COLLECT ON THE ACTUAL INSURANCE POLICY?

26       A    NO.  I WOULD HAVE SIGNED A CLAIM FORM, BUT

27  ONCE THE CLAIM IS SUBMITTED TO THE INSURANCE COMPANY,

28  THEY HANDLE IT FROM THERE.

1       Q       OKAY.

2               SO SOMEONE WOULD HAVE HAD TO GET A

3   SIGNATURE SIGN-OFF FROM YOU AS A FIRST STEP TOWARD

4   COLLECTING ON THE POLICY?

5       A       YES.

6       Q       ALL RIGHT.

7               DID YOU EVER SIGN ANY SUCH FORM FOR THE

8   DEFENDANT, HENRY HAYES, FOLLOWING YOUR MEETING WITH

9   HIM REGARDING THE POLICY?

10      A       I DON'T THINK SO, NO.

11      Q       AND THAT WAS AFTER A CONVERSATION THAT YOU

12  HAD WITH LOS ANGELES POLICE DEPARTMENT DETECTIVES?

13      A       THAT'S CORRECT.

14      MR. GRACE:  THANK YOU, YOUR HONOR.

15              I DON'T HAVE ANY FURTHER QUESTIONS FOR THIS

16  WITNESS.

17      THE COURT:  MR. STERNFELD.

18      MR. STERNFELD:  YES.

19

20                      CROSS-EXAMINATION

21

22  BY MR. STERNFELD:

23      Q       GOOD MORNING, MISS MORGAN.

24      A       GOOD MORNING.

25      Q       WORKING BACKWARDS A LITTLE BIT, DO YOU

26  REMEMBER WHEN YOU MET WITH MR. HAYES, THE DAY THAT YOU

27  MET WITH HIM?

28      A       I REMEMBER THE MEETING.

1    Q    OKAY.

2         DO YOU REMEMBER WHAT DAY IT WAS IN

3    RELATIONSHIP TO THE 30TH OF AUGUST?

4    A    NO, I DON'T.

5    Q    OKAY.

6    A    IT WAS WITHIN A FEW DAYS.

7    Q    ALL RIGHT.

8         AND WHEN YOU MET WITH MR. HAYES, HE SEEMED

9    TO BE POLITE TO YOU?

10   A    YES.

11   Q    AND HE WAS -- SEEMED TO BE RATHER CALM?  HE

12   WASN'T RUDE IN ANY WAY?

13   A    THAT'S CORRECT.

14   Q    HE WAS ATTEMPTING TO FIND OUT WHAT

15   BENEFITS, IF ANY, HIS WIFE HAD HAD; IS THAT RIGHT?

16   A    THAT'S CORRECT.

17   Q    WHEN WE SPEAK ABOUT BENEFITS, IS IT FAIR TO

18   SAY THAT AN EMPLOYEE OF YOUR COMPANY WOULD HAVE HEALTH

19   INSURANCE?

20   A    YES.

21   Q    AND WOULD THAT BE AS A RESULT OF ACTUALLY

22   JUST BEING AN EMPLOYEE OF YOUR COMPANY?

23   A    (NO AUDIBLE RESPONSE.)

24   Q    THAT WOULD BE PROVIDED AS A GROUP POLICY?

25   A    YES, BUT INDIVIDUALS HAVE AN OPTION TO SIGN

26   UP FOR IT OR NOT, BECAUSE THERE IS SOME PORTION THAT

27   THEY PAY.

28

1     Q     OKAY.

2           AND THE OTHER BENEFITS THAT SOMEBODY MIGHT

3     HAVE HAVE TO DO WITH INVESTMENTS, YOU KNOW, MAYBE A

4     401K OR SOMETHING OF THAT NATURE?

5     A     YES.

6     Q     AND ALSO, AS A MATTER OF COURSE, AN

7     INDIVIDUAL THAT WORKS FOR YOUR COMPANY IN THE CAPACITY

8     THAT MISS HAYES DID, WOULD THEY HAVE A LIFE INSURANCE

9     POLICY AS AN AUTOMATIC EMPLOYEE JUST BY BEING EMPLOYED

10    THERE?

11    A     YES.

12    Q     AND WOULD THAT POLICY BE ONE TIMES THE

13    ANNUAL SALARY OF AN INDIVIDUAL?

14    A     YES.

15    Q     ALL RIGHT.

16          IF YOU WANTED TO IN FACT PAY A PREMIUM, A

17    SMALL PREMIUM, YOU COULD GET MORE LIFE INSURANCE; IS

18    THAT CORRECT?

19    A     YES.

20    Q     AND SHE DID THAT IN THIS CASE?

21    A     YES.

22    Q     AND IT WAS FOUR TIMES THE POLICY --

23    A     YES.

24    Q     EXCUSE ME.  FOUR TIMES THE ANNUAL SALARY?

25    A     YES.

26    Q     ALL RIGHT.

27          WHEN MR. HAYES WAS SPEAKING WITH YOU, HE

28    WAS SPEAKING ABOUT A VARIOUS -- ABOUT VARIOUS THINGS,

1   INCLUDING IF YOU HAD ANY KNOWLEDGE ABOUT HER PROPERTY,

2   ABOUT HIS WIFE'S PROPERTY; IS THAT CORRECT?

3        A.    I BELIEVE SO, YES.

4        Q    AND HE WANTED TO KNOW ABOUT THE PROTOCOL

5   OR -- I KNEW I WOULD USE THAT WORD CORRECTLY SOME

6   DAY -- THE PROTOCOL TO GET THE PROPERTY, TO OBTAIN THE

7   PROPERTY?

8        A.    YES.

9        Q    AND HE WAS MAKING AN INQUIRY ABOUT IN

10  GENERAL WHAT HER BENEFITS MIGHT BE?

11       A.    YES.

12       Q    ALL RIGHT.

13            AND IN FACT YOU ARE THE PERSON THAT IS IN

14  CHARGE WITH ADMINISTERING THE BENEFITS FOR CENTINELA

15  HOSPITAL AND THE EMPLOYEES, CORRECT?

16       A    YES.

17       Q    ALL RIGHT.

18            SOMETIMES IN YOUR EXPERIENCE ARE THERE

19  ACTUAL POLICIES THAT INCLUDE FUNERAL EXPENSE POLICIES

20  OR FUNERAL EXPENSE BENEFITS?

21       A.    I BELIEVE SO.

22       Q    OKAY.

23            AND WAS THERE SOME INQUIRY BY MR. HAYES

24  ABOUT THAT?

25       A    I DON'T REMEMBER OFFHAND.  THERE COULD HAVE

26  BEEN.

27

28

1    Q    OKAY.

2         AND BECAUSE YOU ARE FAMILIAR WITH THE -- I

3  GUESS LANGUAGE OF THE POLICIES AND THE PROCEDURES THAT

4  NEED TO BE FOLLOWED THROUGH, YOU WERE SPEAKING TO HIM

5  ABOUT ALL OF THAT?

6    A    YES.

7    Q    AND DID YOU INDICATE TO HIM AT SOME POINT

8  THAT THE INITIAL PROCESS THAT NEEDS TO BE DONE IS SOME

9  CLAIM FORMS HAVE TO BE EITHER SENT TO HIM OR HE HAS

10  GOT TO SIGN SOME CLAIM FORMS AT THE OFFICE?

11    A    YES.  THAT WOULD BE FOR THE LIFE INSURANCE

12  PART OF THE BENEFITS.

13    Q    OKAY.

14         AND WE TALK ABOUT HEALTH INSURANCE IN TERMS

15  OF MISS HAYES' BENEFITS.  WHEN OBVIOUSLY SOMEBODY

16  QUITS WORK AT YOUR PARTICULAR HOSPITAL OR IN THE

17  UNFORTUNATE -- WELL, STRIKE THAT.

18         IF IN FACT SOMEBODY PASSES AWAY, WOULD A

19  SPOUSE OR A CHILD OF THAT EMPLOYEE MAYBE HAVE COBRA

20  INSURANCE WHERE THE INSURANCE, THE HEALTH INSURANCE,

21  WOULD EXTEND FOR A PERIOD OF TIME?

22    A    YES.

23    Q    AND YOUR COMPANY ADMINISTERS THAT AS WELL

24  OR DIRECTS THE PERSON, THE SPOUSE OR THE RELATIVE OR

25  WHATEVER, IF THEY ARE COVERED, TO FACILITATE THAT KIND

26  OF COVERAGE?

27    A    YES.

28

1          Q      THE -- NORMALLY WHAT HAPPENS -- I AM SURE

2    BECAUSE YOU ARE A VERY BUSY PERSON, YOU HAVE PEOPLE

3    THAT WORK UNDER YOU -- WHEN YOU GET NOTIFIED BY

4    SOMEBODY IN YOUR HOSPITAL THAT AN EMPLOYEE HAS EITHER

5    DIED OR HAS QUIT, DO YOU NORMALLY WAIT FOR SOMEBODY TO

6    CONTACT YOU?  LET'S SAY, IN THE EVENT SOMEBODY HAS

7    PASSED AWAY, A FAMILY MEMBER WOULD GENERALLY CONTACT

8    YOU, MAKE AN INQUIRY ABOUT THE BENEFITS?

9          A      YES.

10         Q      OKAY.

11                AND SO IN YOUR MIND THIS WAS NOT AT ALL

12   UNUSUAL THAT SOMEBODY UNFORTUNATELY WHO WAS EMPLOYED

13   BY YOUR HOSPITAL PASSED AWAY, THAT A FAMILY MEMBER, BE

14   IT A SPOUSE OR ANOTHER RELATIVE, CONTACTED YOU,

15   CORRECT?

16         A      THAT'S CORRECT.

17         Q      ALL RIGHT.

18                THIS I IMAGINE CAN BE A COMPLICATED

19   PROCEDURE FOR LAYMEN, PEOPLE LIKE MYSELF, OTHER PEOPLE

20   THAT REALLY DON'T KNOW THE SPECIFICS OF WHAT TO DO AND

21   HOW TO GO ABOUT FACILITATING OBTAINING BENEFITS?  IS

22   THAT FAIR TO SAY?

23         A      I CAN'T REALLY JUDGE HOW SOMEONE ELSE WOULD

24   PERCEIVE IT TO BE.

25         Q      IN YOUR EXPERIENCE WHEN PEOPLE COME IN, ARE

26   THEY FAIRLY IGNORANT ABOUT WHAT TO DO AND YOU ARE

27   THERE TO HELP THEM AND ASSIST THEM?

28         A      YES.

1       Q       I MEAN, THAT IS PART OF YOUR JOB?

2       A       YES.

3       Q       AMONG OTHER THINGS?

4       A       YES.

5       Q       OKAY.

6               AND AT SOME POINT AN ACTUAL CLAIM OR THE

7    PAPERWORK IS SENT OFF TO WHAT ONE WOULD TERM A

8    CARRIER, THE INSURANCE CARRIER?

9       A       YES.

10      Q       THEY ULTIMATELY MAKE A DECISION IF THERE IS

11   ANY ISSUE ABOUT BENEFITS TO BE PAID, INCLUDING LIFE

12   INSURANCE?  YOU DON'T MAKE THAT DECISION?

13      A       THAT'S CORRECT.

14      Q       ALL RIGHT.

15              BUT ON OCCASION, I IMAGINE, AS IN THIS

16   PARTICULAR CASE, WHEN YOU GOT A PHONE CALL AND YOU

17   ACTUALLY SPOKE TO THE POLICE, THEY INDICATED TO YOU

18   THAT THEY WANTED YOU TO PUT A HOLD ON THE WHOLE

19   PROCESS, CORRECT?

20      A       THAT'S CORRECT.

21      Q       ALL RIGHT.

22              AND THEN YOU TOOK IT UPON YOURSELF, BASED

23   UPON THEIR COMMUNICATION TO YOU, TO IN FACT DO THAT?

24      A       YES.

25      Q       OKAY.

26              DOES THAT HAPPEN ON OCCASION?

27      A       I DON'T THINK THAT HAS EVER HAPPENED IN MY

28   EXPERIENCE.

1      Q      OR IS THERE A HOLD PLACED SOMETIMES ON THE

2   PAPERWORK, IRRESPECTIVE OF WHAT REASON?

3      A      I CAN'T RECALL ANOTHER OCCASION.

4      Q      WHEN YOU HAD CONTACT WITH MR. HAYES

5   PERSONALLY, AT SOME POINT DO YOU RECALL TELLING HIM

6   THAT YOU WOULD IN FACT MAIL HIM SOME PAPERWORK?

7      A      (NO AUDIBLE RESPONSE.)

8      Q      OR SEND HIM SOME FORMS?

9      A      I PROBABLY WOULD HAVE SAID THAT.

10     Q      AND THEN AT SOME POINT LATER ON, AFTER YOU

11  HAD THE MEETING WITH HIM, DID YOU SPEAK TO HIM OVER

12  THE TELEPHONE?

13     A      I BELIEVE SO, YES.

14     Q      AND DID YOU INDICATE TO HIM OVER THE

15  TELEPHONE THAT THERE WAS A HOLD PLACED ON THE CLAIM

16  FORMS AND EITHER GET BACK TO ME AT A LATER POINT OR I

17  WILL CONTACT YOU IF THERE IS ANY CHANGE?

18     A      I DID INFORM HIM ABOUT THE HOLD.

19     Q      AND HE UNDERSTOOD THAT?

20     A      YES.

21     MR. STERNFELD:   OKAY.

22

23          (BRIEF PAUSE.)

24

25     MR. STERNFELD:   MAY I HAVE JUST ONE MOMENT,

26  JUDGE?

27     THE COURT:   CERTAINLY.

28

```
 1              (DISCUSSION HELD OFF THE

 2              RECORD BETWEEN DEFENSE

 3              COUNSEL.)

 4

 5      Q     BY MR. STERNFELD:  I THINK YOU SAID ON

 6   DIRECT EXAMINATION, WHEN MR. GRACE WAS ASKING YOU SOME

 7   QUESTIONS, THAT AT SOME POINT ONE OF MISS HAYES'

 8   FAMILY MEMBERS, I BELIEVE YOU SAID A SISTER, CONTACTED

 9   YOU OR CONTACTED YOUR OFFICE?

10      A     NO.  WHAT I HAD SAID WAS THAT HER

11   SUPERVISOR CONTACTED ME AND TOLD ME THAT ONE OF

12   VANGELA'S CO-WORKERS MET VANGELA'S SISTER AT HER

13   HOUSE.

14      Q     MAYBE I MISUNDERSTOOD YOU.  I THOUGHT ALSO

15   YOU INDICATED, AND MAYBE I AM MISTAKEN, THAT IN FACT

16   AT SOME POINT, MAYBE NOT ON THE 27TH, MAYBE ON THE

17   30TH OF AUGUST OF 1999, OR SHORTLY THEREAFTER, THAT

18   ONE OF MISS HAYES' SISTERS ACTUALLY CONTACTED YOU OR

19   YOUR OFFICE REGARDING THE LIFE INSURANCE POLICY OR THE

20   BENEFITS?

21      MR. GRACE:  OBJECTION, YOUR HONOR.

22              ASSUMES A FACT NOT IN EVIDENCE.

23      THE COURT:  OVERRULED.

24              DO YOU KNOW IF THAT HAPPENED?

25      THE WITNESS:  I NEVER TALKED ABOUT IT BEFORE, BUT

26   AT ONE POINT HER FAMILY DID CONTACT ME.

27      Q     BY MR. STERNFELD:  OKAY.

28              DO YOU REMEMBER WHEN THAT WAS?
```

1      A      SOMETIME, YOU KNOW, WITHIN A WEEK OR TWO, I

2   IMAGINE.

3      Q      OKAY.

4      A      I DON'T KNOW SPECIFICALLY.

5      Q      AND IF YOU KNOW, CAN YOU TELL US WAS THE

6   BENEFITS PACKAGE, THAT IS TO SAY, THE LIFE INSURANCE

7   POLICY, WAS THAT EVENTUALLY PAID OUT BY THE CARRIER?

8      A      I DON'T KNOW IF IT EVER WAS.

9      Q      YOU DON'T KNOW IF THERE WAS A CLAIM MADE BY

10   SOMEBODY OTHER THAN MR. HAYES, SOMEBODY IN MISS HAYES'

11   FAMILY, HER RELATIVES, LIKE HER SISTERS OR MOTHER OR

12   FATHER?  YOU DON'T KNOW ABOUT THAT?

13      A      I REALLY DON'T KNOW.

14      MR. STERNFELD:  OKAY.  ALL RIGHT.

15          THANK YOU.

16      THE COURT:  MR. GRACE.

17      MR. GRACE:  JUST ONE QUESTION.

18

19                REDIRECT EXAMINATION

20

21   BY MR. GRACE:

22      Q      MS. MORGAN, SO IN THE WHOLE TIME THAT YOU

23   HAVE BEEN WORKING FOR CENTINELA HOSPITAL, THAT WAS THE

24   ONLY TIME THAT YOU ARE AWARE OF THAT AN INSURANCE

25   POLICY WAS HELD UP UNDER THESE CIRCUMSTANCES?

26      A      YES.

27      Q      AND THAT WOULD HAVE BEEN AT THE REQUEST OF

28   THE POLICE?

1         A     YES.

2         MR. GRACE:  THANK YOU, YOUR HONOR.

3              I DON'T HAVE ANY FURTHER QUESTIONS.

4         THE COURT:  MR. STERNFELD

5

6              (DISCUSSION HELD OFF THE

7              RECORD BETWEEN DEFENSE

8              COUNSEL.)

9

10        MR. STERNFELD:  NO.  I HAVE NO QUESTIONS.

11        THE COURT:  ANY QUESTIONS FROM THE JURY?

12

13             (THE JURORS AND ALTERNATE

14             JURORS ANSWERED COLLECTIVELY

15             IN THE NEGATIVE.)

16

17        THE COURT:  ALL RIGHT.

18             MISS MORGAN, THANK YOU VERY MUCH FOR COMING

19   IN.

20             PLEASE DON'T DISCUSS YOUR TESTIMONY WITH

21   ANY OF THE OTHER WITNESSES UNTIL THE CASE IS OVER.

22             OKAY.  THANK YOU VERY MUCH.

23             IF YOU WOULD JUST HAND THOSE DOCUMENTS BACK

24   TO THE DISTRICT ATTORNEY.

25        MR. GRACE:  THANK YOU.

26        THE COURT:  MR. GRACE, WHO IS NEXT?

27        MR. GRACE:  YOUR HONOR, WE HAVE JUST GOTTEN WORD

28   THAT OUR THIRD WITNESS FOR THE MORNING IS NOT GOING TO



EXHIBIT

# BRAIN-POWER

## Professional Investigations - Risk Management Services

ACCIDENTAL DEATH CLAIM
FINAL REPORT

INSURED:   Hayes, Vangela       REQUESTOR:  Virginia Diaz
                                  COMPANY:    Transamerica Assur.

ADDRESS:   631 1/2 West Gage Avenue    ADDRESS:    P.O. Box 30852
            Los Angeles, CA                         Los Angeles, CA
                                    FILE:  5319

EMPLOYER:  Not Shown                CLAIM:  15886-VAD
                                  ACCOUNT:  505

DOB:       1-18-60                  DATE OF REPORT:  02-21-00

Los Angeles County Coroner      The AUTOPSY REPORT which included the
1104 N. Mission Road          Report of Toxicological Analyses and the
Los Angeles, CA             INVESTIGATOR'S REPORT was sent to you with
                          my STATUS REPORT of 02-14-00.  There was a
$62.00 fee charged for these reports.

Det. Solorza                 Information from this detective was
77th Station               provided to you with my ACKNOWLEDGEMENT
Los Angeles, CA            of 01-31-00.

Dept of Vital Records        Enclosed for your review are CERTIFIED
12400 E. Imperial Hwy.       COPIES of the Certificate of Death on your
Norwalk, CA              insured and her daughter, "Te Anna Sherise
                          Hayes".  There was a $16.00 fee charged for
                          these copies.

Based on the above I am closing my handling at this time.  Should you
desire any additional handling, please advise.

Thank you very much for this assignment.

Steve McBrain

# Centinela Hospital
# Medical Center

Tenet HealthSystem

January 3, 2000

TO: Trans America Life Companies

FROM: Arvella James, Sr. Human Resources Representative

RE: Vangela L. Hayes
ss#: 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

TeAnna S. Hayes
ss#: 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

---

This is the answer to question #22 on the Death Claim Form:

Vangela Hayes had —

| | |
|---|---|
| Core Life | $30,000 |
| Core AD&D | $30,000 |
| Supplemental Life | $120,000 |
| Supplemental AD&D | $120,000 |
| Total | $300,000 |

TeAnna Hayes had —

| | |
|---|---|
| Child Life | $10,000 |
| Child AD&D | $10,000 |
| Total | $20,000 |

*World Class, Community Close*
555 E. Hardy Street • Inglewood, California 90301-4011
P.O. Box 720 • Inglewood, California 90307-0720 • Phone: 310/673-4660

TENET

NSAMERICA
COMPANIES

Transamerica Assurance Company
P.O. Box 30852
Los Angeles, CA 90030-0852

COPY

Death Claim Form

Proof of Death    ☒ Insured    ☐ Spouse    ☒ Child

laims: When submitting a "Death" Claim, the following information will be required:

f of Death Form. In the event of a dependent claim, it is necessary that the "Employee's Statement" portion be completed. It is always
ssary that the "Employer's Statement" portion be completed and signed by an authorized representative of the Employer (Policyholder).

ified Copy of the Death Certificate.

ollment Form. A Photocopy of the Insured's Enrollment Form will be required.

fication of Premium Deduction or Payment. It is necessary that we have verification that a premium deduction or payment was made for
rage for the period in which the loss occurred.

have beneficiary submit the appropriate document below if beneficiary is:

or          – Submit a certified copy of guardian's letters of appointment, if a guardian has been appointed. If no guardian has been appointed,
etent           furnish full name and address of person who has custody of the minor or incompetent.

             – Submit a certified copy of the appointment of the Executor or Administrator. If estate is not to be probated furnish name, address
               and relationship of next-of-kin.

ed          – Submit a certified copy of beneficiary's Certificate of Death. Also see following instruction.

## Employer's Statement

| Deceased | Age | Employee's Name (if this is a dependent claim) | Group Policy Number | Employee's Social Security Number |
|---|---|---|---|---|
| nela L. Hayes | 2. 39 | 3. Vanela L. Hayes | 4. 059 28011 | 5. 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 |

| rtificate Number | Date Insured (Employee Coverage) | Date Insured (Dependent Coverage) | Date Claimant (Employee) last worked |
|---|---|---|---|
| 7. 1/1/99 | | 8. 1/1/99 | 9. 8/25/99 |

Claim, give relationship to insured
daughter

If Dependent Claim, was claimant entirely dependent on insured?
11.

If Yes, how long?
12.

is
death

Date and Time of Loss
14. Month _____ Day _____ Year _____  A.M. P.M.

Was Premium paid and Insurance in force at time of death?
15.  ☒ Yes  ☐ No

ployed
2/24/95

Was insured considered an employee at date of loss?
17.  Yes

annual salary as per date of the loss
2,968

| | Workers' Compensation? | Amount of Insurance? | Amount of Claim? |
|---|---|---|---|
| accident? | 20. ☐ Yes  ☒ No | 21. | 22. See Attached |

| | Relationship | Age | Beneficiary's Address |
|---|---|---|---|
| Anna Hayes / Henry C. Hayes | Daughter  Hayes | 25. 34 | 26. |

this 3rd day of January, 2000

nela Hospital Medical Center
Name of Company

Willa Jane
Signature

Sr. Human Resources Rep.
Official Position

## Employee's Statement
(Complete Only If This Is A Dependent Claim)

| las deceased lived in your home? | How long entirely dependent on you? | Where did deceased last work? |
|---|---|---|
| | 2. | 3. |

s Date of Birth

Employee's Signature _____

Employee's Social Security # _____

Employee's Birthdate _____

RECEIVED
MAR 07

## Fraud Statement

...erson who knowingly and with intent to defraud any insurance company or other persons, files a statement of claim containing any materially ...e information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance ., which is a crime, subject to criminal prosecution and civil penalties.

## Authorization To Obtain Information

, authorize and request that you furnish Transamerica Occidental Life Insurance Company or its representative, with any and all facts and dates ...ay be desired in reference to history of

GELA HAYES _____, Deceased.

...ize Transamerica Occidental Life Insurance Company or its representative to obtain at its expense, copies of any and all portions of the records ...ing the physical and medical record of

GELA HAYES _____, Deceased.

RSTAND the information obtained by use of this Authorization will be used by Transamerica Life Companies or its representative to determine ...y benefits under existing coverage. Any information obtained will not be released by Transamerica Life Companies or its representative to any person ...rization EXCEPT to reinsuring companies, or other persons or organizations performing business or legal services in connection with the claim, or ...be otherwise lawfully required, or as I may further authorize.

...I that I may request a copy of this Authorization. I AGREE that a photographic copy of this Authorization shall be as valid as the original. I AGREE ...horization shall be valid for the period required to process the claim.

2/19/200_

Claimant's Signature _____
Deloris. harris

Birthdate : 4/10/42

Social Security # 419-60-720 /

Phone # 323-735-189/

3315 Montclair Street
Los Angeles, CA 90018

C4

ANSAMERICA
E COMPANIES

Tra[...] [...]rica Azurance Company
P.O. Box 30852
Los Angeles, CA 90030-0852

Accidental Death
Claim Form

## Claim Form For Accidental Death of    ☐ Employee    ☐ Dependent

ental Death Claims: When submitting a "Death" Claim, the following information will be required:

e completion of both sides of this claim form.

o-of of Death Form. In the event of a dependent claim, it is necessary that the "Employee's Statement" portion be completed. It is always cessary that the "Employer's Statement" portion be completed and signed by an authorized representative of the Employer (Policyholder).

irtified Copy of the Death Certificate.

iro'lment Form. A Photocopy of the insured's Enrollment Form will be required.

rification of Premium Deduction. It is necessary that we have verification that a premium deduction, as well as the premium amount, was ide for coverage for the period in which the accident occurred.

Copy of the Coroner's Report, Accident Report and/or Newspaper Clippings. Copies of these should be secured and forwarded to us along th the above forms and reports.

i have beneficiary submit the appropriate document below if beneficiary is:

or or     — Submit a certified copy of the appointment of the guardian of the estate of the minor or incompetent if a guardian has been
petent       appointed. If no guardian has been appointed, furnish full name and address of person who has custody of the minor or
              incompetent.
           — Submit a certified copy of the appointment of the Executor or Administrator. If estate is not to be probated furnish name, address
              and relationship of next-of-kin.
sed        — Submit a certified copy of beneficiary's Certificate of Death.

## Employer's Statement

| Deceased | | Age | Employee's Name | | | Group Policy Number | Employee's Soc. Sec. No. |
|---|---|---|---|---|---|---|---|
| | | 2. | 3. | | | 4. | 5. |
| Employee Coverage) | Date Insured (Dependent Coverage) | | Date Employee last worked | | Employee was: | | Employee's Class Number |
| h | 7. | | 8. | | 9. ☐ Salaried   ☐ Hourly | | 10. |
| | | | Date and Time of death | | | Was Premium paid and Insurance in force at time of accident? | |
| | | | 12. Month ___ Day ___ Year ___ | | A.M.  P.M. | 13. ☐ Yes   ☐ No | |
| i details of accident fully (use reverse side if necessary) | | | | | | | |
| r on duty? | Employee's Annual Salary as per date of the accident | | | Amount of Insurance? | | Amount of Claim? | |
| ☐ No | 15. | | | 17. | | 18. | |

this _____ day of _____, 19_____

Name of Company                    Signature                    Official Position

## Employee's Statement
(Complete Only If This Is A Dependant Claim)

| Date of Birth | Relationship to Employee | | How long has dependent lived in your home? | How long was deceased entirely dependent on you? |
|---|---|---|---|---|
| | 2. ☐ Spouse   ☐ Son   ☐ Daughter | | 3. | 4. |
| Marital Status: | | | Was dependent employed? | If "Yes," name of employer |
| ☐ Married   ☐ Divorced   ☐ Legally Separated | | | 6. ☐ Yes   ☐ No | 7. |

## Information About The Beneficiary/Claimant:

me (please print) __CORNELIUS HARRIS, SR. and DELORIS HARRIS__

dress __3315 Montclair Street, Los Angeles, CA  90016__

h date __7-3-38__ _____ Your phone No.: day (323) __735-1891__ · evenings (323) __735-1891__

Deloris  4/16/1942
r Identification No. or Social Security No. __CH: 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 / DH: 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__

nplete the reverse side)*

Cornelius Harris Sr.    2/15/2011
Signature of Claimant                    Date

[signature]    2/14/2011

## Fraud Statement

irson who knowingly and with Intent to defraud any Insurance company or other persons, files a statement of claim containing any materially nformation, or conceals for the purpose of misleading, Information concerning any fact, material thereto, commits a fraudulent Insurance hich is a crime, subject to criminal prosecution and civil penalties.

appropriate box to Indicate that you are or are not subject to backup withholding under the provisions of Section 3406 (a)(1)(c) of the Internal Code.

I am not subject to backup withholding.

I am subject to backup withholding.

come Tax Law requires that each Claimant furnish us with a social security number or taxpayer identification number and certify that he or she ject to backup withholding. You are subject to backup withholding under Internal Revenue Code Section 3406 (a)(1)(c) if you were notified that underreported interest or dividends or you were required to but failed to file a return which would have included reportable interest or dividend . If you have not been so notified, check the appropriate box above. We are required to withhold 20% of any taxable interest, dividends and certain ments if you fail to furnish us with this information.

## Authorization To Obtain Information

authorize and request that you furnish Transamerica Occidental Life Insurance Company or its representative, with any and all facts and dates ry be desired in reference to history of

NA HAYES _____, Deceased.

re Transamerica Occidental Life Insurance Company or its representative to obtain at its expense, copies of any and all portions of the records ng the physical and medical record of

NA HAYES _____, Deceased.

RSTAND the Information obtained by use of this Authorization will be used by Transamerica Life Companies or its representative to determine / benefits under existing coverage. Any information obtained will not be released by Transamerica Life Companies or its representative to any person ilzation EXCEPT to reinsuring companies, or other persons or organizations performing business or legal services In connection with the claim, or be otherwise lawfully required, or as I may further authorize.

/ that I may request a copy of this Authorization. I AGREE that a photographic copy of this Authorization shall be as valid as the original. I AGREE horization shall be valid for the period required to process the claim.

nt's Signature _Cornelius Harris, Sr._  Date _2/19/2000_

_Deloris Harris_

No. 60411920

**TRANSAMERICA OCCIDENTAL LIFE**
Transamerica Occ
Life Insurance Compა
HOME OFFICE: Los Angeles

RETAIN THIS PORT
FOR YOUR RECORDS

NOT NEGOTIABLE

| CHECK DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|
| JULY 21, 2000 | 0000000034 | $*******10,000.00 |

PAYMENT UNDER POLICY 05928030          CLAIM #. TT0015895-VA
INSURING TE ANNA HAYES

STATEMENT OF PROCEEDS FOR POLICY NO. 05928030
AMT OF POLICY  $    10,000.00

| INTEREST @ 0.00% | | | NET PAYABLE | | 10,000.00 |
|---|---|---|---|---|---|
| ============== | | | ============== | | |
| TOTAL | $ | 10,000.00 | TOTAL | $ | 10,000.00. |

Detach Below

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TRANSAMERICA OCCIDENTAL LIFE**
Transamerica Occidental
Life Insurance Company
HOME OFFICE: Los Angeles

| | DATE | | No. 60411920 |
|---|---|---|---|
| | JUL 21, 2000 | 0000000034 | |
| | Void After 90 Days | | 62-26 |
| | | | 311 |
| | | | 6832-09 |

PAYMENT UNDER POLICY 05928030          CLAIM # TT0015895-VA
INSURING TE ANNA HAYES

$*******10,000.00

VOID

TEN THOUSAND AND 00/100 - - - - - - - - - - - - - - - - - - - - - - - - - - - - DOLLARS

RICARDO A. TORRES, II,
CORNELIUS HARRIS & DELORIS HARRIS
C/o RICARDO A. TORRES, II ESQ
1605 W. OLYMPIC BLVD. SUITE 1036
LOS ANGELES, CA  90015

_Sally S. Yamada_
AUTHORIZED SIGNATURE

⑈60411920⑈

**TRANSAMERICA OCCIDENTAL LIFE**
Transamerica Occidental Life Insurance Comp.
HOME OFFICE: Los Angeles

No. 60411922

RETAIN THIS FOR FOR YOUR RECORDS

NOT NEGOTIABLE

| CHECK DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|
| JULY 21, 2000 | 0000000036 | $********30,000.00 |

PAYMENT UNDER POLICY 05928040         CLAIM # TT0015886-VA
INSURING VANGELA L. HAYES

        STATEMENT OF PROCEEDS FOR POLICY NO. 05928040
AMT OF POLICY   $      30,000.00

| INTEREST @ 0.00% | NET PAYABLE | 30,000.00 |
|---|---|---|
| ============== | | ============== |
| TOTAL    $     30,000.00 | TOTAL    $     30,000.00 | |

Detach Below

**TRANSAMERICA OCCIDENTAL LIFE**
Transamerica Occidental Life Insurance Company
HOME OFFICE: Los Angeles

DATE
JUL 21, 2000      0000000036

No. 60411922

62-25
311
6222-09

PAYMENT UNDER POLICY 05928040      CLAIM # TT0015886-VA
INSURING VANGELA L. HAYES

Void After 90 Days

$********30,000.00

VOID

THIRTY THOUSAND AND 00/100 ------------------------------------ DOLLARS

    RICARDO A. TORRES, II,
    CORNELIUS HARRIS & DELORIS HARRIS
    C/O RICARDO A. TORRES, II ESQ
    1605 W. OLYMPIC BLVD. SUITE 1036
    LOS ANGELES, CA  90015

Sally S. Yamada
AUTHORIZED SIGNATURE

ASE

TRANSAMERICA OCCIDENTAL LIFE
Transamerica Occidental
Life Insurance Company
HOME OFFICE: Los Angeles

RETAIN THIS PORTION
FOR YOUR RECORDS

No. 00411921

NOT NEGOTIABLE

| CHECK DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|
| JULY 21, 2000 | 0000000035 | $*******120,000.00 |

PAYMENT UNDER POLICY 05928030          CLAIM # TT0015886-VA
INSURING VANGELA L. HAYES


          STATEMENT OF PROCEEDS FOR POLICY NO. 05928030
AMT OF POLICY  $   120,000.00



INTEREST @ 0.00%          NET PAYABLE          120,000.00
          =============          =============
TOTAL      $   120,000.00     TOTAL     $   120,000.00


                              Detach Below

---

TRANSAMERICA OCCIDENTAL LIFE
Transamerica Occidental
Life Insurance Company
HOME OFFICE: Los Angeles

DATE
JUL 21, 2000          0000000035
Void After 90 Days

No. 60411921

62-25
311
6832-09

PAYMENT UNDER POLICY 05928030          CLAIM # TT0015886-VA
INSURING VANGELA L. HAYES

$*******120,000.00

VOID

ONE HUNDRED TWENTY THOUSAND AND 00/100 --------------------------------------- DOLLARS

RICARDO A. TORRES II
CORNELIUS HARRIS & DELORIS HARRIS
C/O RICARDO A. TORRES II ESQ
1605 W. OLYMPIC BLVD. SUITE 1036
LOS ANGELES, CA  90015

Sally S. Yamada
AUTHORIZED SIGNATURE

SE

⑈604⑈⑈9 2⑈⑈   ⑈⑈03⑈⑈00 26 2⑈⑈



EXHIBIT

## PARKER · STANBURY LLP
ATTORNEYS AT LAW

DOUGLASS H. MORI
JOHN D. BARRETT, JR. *
ROBERT W. LOPRESTI *
RONALD L. SMITH
J. LUIS GARCIA †
MICHAEL E. McCABE
MATTHEW W. DAVIS
REYNALDO C. SANTOS
DAVID E. COWAN
GEORGE A. HUNLOCK
B. PETER LEE

MARCUS BASTIDA
THERESA J. CARROLL
ROSEMARIE MERRILL
DAVID C. LANE
DANA C. GIOVINE
MATHEW L. MAY
PATRICK M. HEVESY
ALAN B. SHEATS
ALEX L. SHIA
JOHN E. REDD
JEFF H. GREEN

**444 SOUTH FLOWER STREET**
**NINETEENTH FLOOR**
**LOS ANGELES, CA 90071-2901**
TELEPHONE (213) 622-5124
FAX (213) 622-4858
E-MAIL: LA@PARKSTAN.COM
MANAGING PARTNER
ROBERT W. LOPRESTI

GLENN M. HABAS
GEORGANN CARMAN
MICHAEL J. GRUSH
JOEL O. MARTINEZ
RICARDO A. MERCADO
J. MARTIN LATHROP
JAMES L. WOLFSEN
GEORGE C. GONZALEZ
KELLY A. SHERIDAN
HANS W. CHEN
ERIK PRIEDKALNS

JUSTIN G. ROBINSON
AARON G. FREEMAN
SUZANNE K. GOLDEN
KAVITA SADANA
MERLE E. GOULD
KENLEY C. DYGERT
GREGORY T. FONG
IAN G. STERLING
HEATHER R. HIGHTOWER
JENNIFER L. NAGEL

* ASSOCIATE IN AMERICAN BOARD OF TRIAL ADVOCATES
† MEMBER OF AMERICAN BOARD OF TRIAL ADVOCATES

HARRY D. PARKER (1891-1976)
RAYMOND G. STANBURY (1904-1966)

IRVINE • LOS ANGELES • SACRAMENTO
RIVERSIDE • SAN DIEGO

4/4/18

Office of The Governor
Legal Affairs Branch
1315 Tenth St
Sacramento, CA 95814

Debbie Asuncion, Warden
California Department of Corrections
44750 60th St. West
Lancaster, CA 93536-1620

Dear Sir or Madame:                          Re:     Mr. Henry Hayes, V16058
                                                     <u>Our File Number: 2591710</u>

This office has consulted with the family of Mr. Hayes. We are writing you today to request Mr.
Hayes be afforded a proper interview regarding his request for clemency. As you may be aware,
Mr. Hayes is a first offender, a college graduate and has been a model inmate proving his
eligibility for clemency. We are informed he has been denied a proper interview. This interview
will serve the purposes of clemency. Mr. Hayes is worthy of mercy and should be afforded at
least a timely interview to set forth his case for clemency. We are additionally informed the
family has made numerous communications to all relevant entities regarding this matter. Neither
the family nor & Mr. Hayes have received any response.

Your attention to this matter is greatly appreciated.

                                             Very truly yours,

                                             PARKER · STANBURY LLP

                                      By
                                             J. Martin Lathrop

jml



EXHIBIT

Henry Cephus Hayes, #V16058
California State Prison-Los Angeles County
P.O. Box 4430 (A1-115L)
Lancaster, CA 93539-4430


June 21, 2018


Office of the Governor
State Capitol
Sacramento, CA 95812

Re: <u>Clemency Consideration</u>

Dear Governor Brown:

    I am Henry Hayes, CDCR# V16058. I was received in the CDCR from
Los Angeles County on December 3, 2003. I am a true first-term inmate,
with no prior incarcerations or probation history. I was sentenced to
LWOP for double-homicide. I faced the death-penalty, with the jury not
reaching a verdict on the issue of death. Prior to incarceration, I
was the Chief Executive Office of a nonprofit religious corporation
with an annual budget of $1.47M. I am a high school graduate and, a
college graduate with a Bachelor and Master dgrees. My education was
accomplished before I was 30 years of age. This is not inclusive to
numerous other diploma and certificate classes obtained over the years.

    In my clemency application, it should be noted that there was a
number of issues that arose during my own post-conviction research into
my case. It was discovered that critical forensic evidence was wrongly
destroyed three years before I went to trial. Such acts were not told
to counsel or myself until ordered by the court to provide all records
of the errors. Furthermore, a number of witness statements and cash
payments were minimized by the prosecution, again, until the court so
ordered full disclosure of the information.

    I submitted a DVD of my original interrogation with police. That
information was never shown to the jury because I was not read my
miranda rights. My reactions, my cooperation, and unwaivering stance
of innocence during the interview were not placed before the jury.
Counsel disregarded an admissible piece of evidence, which could have
come in through a motion in limine. I recently obtained CD media
evidence not properly used by trial counsel. It to went to a motive
not to commit the crime for which I was charged.

    I have **positively** programmed. I have one RVR-115, for which I
pled guilty to. I have completed domestic violence and anger management
classes. I pray that with the delay that I be offered a reasonable
opportunity to interview and state more specific facts. Thank you for
your precious time and consideration to schedule me for an interview.
Hopefully very soon.

Cordially,

Henry C. Hayes, #V16058
California State Prison-LAC
P.O. Box 4430 (A1-115)
Lancaster, CA 93539-4430


December 28, 2017


Office of the Governor
Attn: Legal Affairs
c/o/ State Capitol, Suite 1173
Sacramento, CA 95814

Re: Clemency Notification to District Attorney

Dear Sir/Madam:

    This is written notification that I have sent to the Los Angeles County District Attorney a copy of my Notice of Intent to Apply for Executive Clemency, with the accompanying application.

    This is the 10 day notification pursuant to Penal Code section 4805, subdivision (a).

    I have enclosed copies of the Notice of Intent and the Statement of Notice to District Attorney. Please log this information as my Application to the Governor will be filed within the 10th day following this notification letter.

    Thank you for  your time an attention this is procedural requirement for applying for executive clemency.


Very truly,

Henry Cephus Hayes,
Applicant


Enclosures